The appellant was indicted for second degree murder of Ervin Lee Black by shooting him with a .410 single barrel shotgun. The jury found the appellant guilty "as charged in the indictment" and fixed punishment at ten years in the penitentiary. The trial court then entered judgment in accordance with this verdict.
Mobile Police Officer William C. Fowler testified that in response to a radio dispatch, he went to 353 Cherry Street, about 1:30 a.m., on the morning of October 26, 1975. Officer Fowler stated that upon his arrival, he found a black male lying "face down" in the street "almost in front of 353 Cherry Street" [R. 19, 20]. Officer Fowler testified that the victim was alive and had been shot in the upper portions of both legs, but stated that their investigation revealed that 353 Cherry Street was not the spot where the shooting took place. Officer Fowler testified that blood imprints on the sidewalk made by tennis shoes, apparently worn by the victim, led them some six blocks to Davis Avenue where "the trail got too faint" to track further [R. 22, 23].
Officer Nowland Ramsey, also of the Mobile Police Department, testified that on the evening of October 27, 1975, he was directed by Sergeant White of the Criminal Investigation Division to go over to the appellant's home "to see if the boy [appellant] was there and to check for some evidence." [R. 24].
Officer Ramsey testified that he did not obtain a search warrant before conducting his investigation, but stated he did receive permission to enter and search the premises from the appellant's sister and father [R. 23]. Officer Ramsey stated that the appellant was not at home when he conducted his search of the appellant's bedroom which produced a coat and a .410 single barrel shotgun [R. 25, 26, 31, 34]. Officer Ramsey testified he took custody of these two items and took them downtown to the Criminal Investigation Division [C.I.D.] of the Mobile Police Department [R. 27]. Officer Ramsey further testified that he arrested the appellant at the appellant's home some forty minutes later after being notified by the radio operator that someone had called and told the police that the appellant was now there [R. 32, 33]. Officer Ramsey testified that after arresting the appellant at his home, he took him directly to C.I.D. where he advised the appellant of his rights under Miranda, which were "read back to him [appellant]" a second time by Sergeant Bowman before the appellant signed his waiver form [R. 34, 39, 182].
Raymond James testified that he was with the deceased, Ervin Lee Black, on the night and early morning in question. He stated that he and Black were at the Am Vets Club where they met a girl and her mother whom they tried to engage in conversation. However, the witness stated that the two "girls" did not care to talk with them, and they then sat down at a table where the appellant was already seated. James stated that he and Black sat down at the table also, and that Black asked the mother of the girl for some of the wine which she had just purchased. James testified that she refused to give Black any of her wine, and that Black and the appellant "went and put their dollars" on another bottle of wine [R. 49]. James stated that the appellant would not allow Black to give him [James] any of the wine because "I didn't put none [money] on it," but that the appellant shortly thereafter offered one of his friends some of the wine. James testified that Black refused to let appellant's *Page 1344 
friend have any wine either, and, with this, an argument between Black and the appellant began. James stated that subsequently the appellant, the girl, and her mother got up from the table and left the Am Vets Club, and that he and Black began following them "down the Avenue" where the appellant and Black continued their argument. The witness stated that several other people, including his brother, Andy "Baby" James, intervened in the argument on behalf of Black. James testified that his brother, "Baby," and the appellant began to fist fight, and that Black and two others also "were jumping in and fighting" the appellant [R. 50, 56]. James testified that they "beat him [appellant] down" and left him lying in a lot "just off the sidewalk" [R. 60]. James stated that he and Black then walked down to the Blue Room Club, but left after about five minutes and headed back toward the Am Vets Club. James testified that as they were walking back, the appellant ran up behind them and said to Black, "You are the one" [R. 52]. James stated that when they turned around, they noticed the appellant was carrying a shotgun under his coat, and that Black then told the appellant, "Man that was not me, that was Baby . . ., if you think I did, you can go on and shoot, but that wasn't me" [R. 53]. James stated he began moving away from the argument, and when he heard a shot, he turned around and saw Black fall. James stated he then ran home and called an ambulance which arrived about fifteen minutes later. James stated that he initially told the ambulance service to come to the corner of Davis and Gaston where Black was shot, but upon learning from Black's girlfriend that "Charles and Hank" had carried Black to his home, he called back and told the ambulance service to pick Black up "on back Cherry Street" [R. 64, 65].
Sergeant Ashville White of the Mobile Police Department testified that he was notified at his home around 7:00 p.m. on October 27, 1975, that Black had died from the gunshot wound he had received from the appellant. Sergeant White stated that he instructed Officer Ramsey to take the appellant in custody and bring him to C.I.D., which Officer Ramsey did about 9:00 p.m. Sergeant White testified that at 9:55 p.m. he "reminded him of his rights" previously read to the appellant by Officers Ramsey and Bowman and stated that the appellant acknowledged that "he fully understood his rights" [R. 70]. Sergeant White stated that the appellant was "willing to give me a statement," and that no threats or promises, hope of reward, or other inducement of any kind were ever made to the appellant [R. 72, 76]. Sergeant White testified that the appellant then gave him a statement in regard to his shooting the now deceased Ervin Lee Black.
After an extensive voir dire examination, during which Sergeant White was questioned by appellant's counsel, the district attorney, and the trial court, the trial court determined that the appellant's statement was voluntarily given, and this statement was admitted in evidence as State's Exhibit No. 4 [R. 75, 77]. Sergeant White further testified that after the process of taking the appellant's statement was completed, he asked the appellant if he suffered any injuries from the beating he received from Black and his friends which required treatment by a physician, and the appellant answered, "No." Sergeant White testified he then stated to the appellant that "the only thing then as a result of this beating that was really hurt was your pride," to which the appellant acknowledged, "Yes" [R. 86].
Dr. James E. Hassel, a resident surgeon at the University of South Alabama Medical Center, testified that he examined the body and signed the death certificate of the deceased. Dr. Hassel stated that Black had received a shotgun wound in the upper left leg and that some of the shot had passed completely through the leg and "entered the medical aspect of the right leg" [R. 94]. Dr. Hassel testified that it was his opinion that death was caused by "complications of the kidney urinal celluar which was secondary to a period of shock because of the blood loss, and a lot of soft tissue injury *Page 1345 
which caused additional kidney injury" [R. 95]. Dr. Hassel further explained in "layman's terms" that as a result of the gunshot wound, Black had a great loss of blood which in turn dropped his blood pressure and put him a state of shock. Dr. Hassel stated that kidneys "partially die" as a result of this trauma and are unable to properly function in order to remove potassium from the blood. Dr. Hassel stated that this "chemical [potassium] got too high and this caused him to die" [R. 95].
On cross-examination, Dr. Hassel noted that because of the soft tissue injury, Black actually received "multiple injury" to his kidneys in that the "chemical from the muscles" also caused kidney damage [R. 97]. Dr. Hassel pointed out that due to "antibodies" in Black's blood, they had great difficulty in typing and matching his blood with blood units available to the hospital, and that this complication caused considerable but unavoidable delay in the treatment of Black's injury [R. 97].
Shiela Diane Scott, testifying on appellant's behalf, stated that she, the appellant, and her sister, Janice, left her home together on the night in question to join her mother who was down at the Blue Room Club. She stated that the appellant "dropped them off" there, and that he told them he was going up to the Am Vets Club, but would return for them in about five minutes. She testified that when the appellant failed to return, they all went looking for him at the Am Vets Club where they found him asleep at a table. She stated that they awakened the appellant, sat down, and that her mother then ordered herself some wine. She testified that "some boys" at the table "tried to get some of my mama's wine"; that the appellant told them to "quit trying to"; and that the appellant told Black if he wanted "to get wine" that he would go in on a bottle with him [R. 104, 105]. She stated that the appellant and Black purchased a bottle of wine together, and when a friend of the appellant's asked for some of their wine, Black refused to let him have any. She stated that as they were leaving, Black told her, "We are going to follow you all everywhere you all go," [R. 106] and did follow them outside the Am Vets Club. She testified that "down the Avenue" a "dude" named "Little Baby" and the appellant got in an argument, and that further up the avenue, "all the dudes got in Robert's face" [R. 107]. The witness testified that a fight then broke out which lasted for about six minutes and left the appellant lying unconscious on the pavement [R. 109]. She stated that the girl who had participated in the fight against the appellant declared, "We done kicked his ass. We will be waiting on his brother if he comes back" [R. 109]. The witness testified that she had to slap the appellant a couple of times to awaken him, and that when the appellant regained consciousness, she told him what the girl had said and the direction they went [R. 109]. She concluded her testimony by stating that the appellant then got up and left "walking real fast" [R. 110, 113].
The appellant's testimony was essentially the same as that of Shiela Diane Scott's in regard to what transpired before they all gathered at the Am Vets Club. He stated that he and Black, whom he had never seen before, "put together" on some wine because he "was trying to keep things down . . .," and that an argument began between Black and himself when he offered a friend of his some of the wine. The appellant testified that Black told him, "What he says goes," and also threatened to hurt him [R. 121]. He stated that their argument continued "all the way down the Avenue," and when they got to Davidson Street, he turned around and a girl named Debra was "standing in my face" [R. 122]. He testified that they began hitting him on the head, and that someone grabbed him from behind and began choking him. The appellant stated he began losing consciousness and "had a feeling I was dying" [R. 123]. The appellant testified he blacked out and was later awakened by Shiela Diane Scott and her mother, then learned that Black and his friends were looking for his brother and had headed "up the Avenue" [R. 123]. *Page 1346 
The appellant testified that he went home and got his shotgun "to find out why they did me like they did, why they jumped me" [R. 124]. The appellant stated he returned with the gun and "spotted them going up the Avenue." He stated he called out to Black and Raymond James, and when they turned around, he had the gun pointed at them. The appellant testified that he did not intend to shoot anyone, but that while he and Black were arguing about "why they jumped me," Black grabbed the gun and tried to take it from him, and the gun accidentally went off when "he jerked it back from him" [R. 124, 125]. The appellant stated that Black ran off, and he did not know whether Black was injured or not [R. 133]. The appellant testified that after the shooting, he walked home "by way of the back streets," and upon his arrival there, he "put the gun under the bed and threw the coat on the books in my room" [R. 144]. The appellant verified that the coat and the .410 shotgun, which were offered in evidence as State's Exhibits No. 2 and No. 1, respectively, were his, and that the condition of both items had not changed other than there were "more wrinkles" in the coat [R. 131-133]. The appellant testified that after he returned home from a visit with a friend the day after the shooting, his mother informed him that the police were looking for him, and that he then told her to call the police and tell them he was there. The appellant stated he was taken to the police station where he waited for about forty minutes before giving a statement to Sergeant White [R. 126]. When presented with the statement marked "State's Exhibit 4," the appellant acknowledged that, "This is the statement I gave . . . Everything in there happened" [R. 127, 133]. The appellant further acknowledged that he had read the statement before signing it and stated that to his knowledge Sergeant White had made no deletions from the complete statement which he had given him [R. 154].
On recross, however, the appellant described State's Exhibit No. 4 as "partially correct" [R. 156]. The appellant remembered Sergeant White stating to him subsequent to the taking of his written statement, "Well, then, it was your pride that got hurt," and testified that his response to Sergeant White at that time was, ". . . [S]ir, now that I think about it, maybe you are right" [R. 149]. However, the appellant reiterated several times that he was physically "hurt" as a result of the beating he suffered from Black and his friends, and that during the fight as they were "choking" and "stomping" him, he knew "for a fact" that he was dying [R. 123, 127, 128, 149].
 I
The appellant contends that the trial court erred in admitting into evidence the coat and shotgun which was obtained as a result of the warrantless search of his bedroom. This Court, per Harris, J., in Welden v. State, 57 Ala. App. 379,328 So.2d 630, 633 (1976), observed:
 "In Daniels v. State, 290 Ala. 316, 276 So.2d 441, Justice Bloodworth, writing for a unanimous court, set forth six exceptions under which warrantless searches have been upheld. These are:
"1. In `plain view;'
 "2. With `consent' voluntarily, intelligently and knowingly given;
"3. As `incident to a lawful arrest;'
"4. In `hot pursuit' or `emergency situations;'
 "5. Where `exigent circumstances' exist coincidental with `probable cause' (as in case of movables); and
"6. In `stop and frisk' situations."
The State asserts that the warrantless search of the appellant's bedroom can be upheld on the "consent" exception noted above. In the area of "consent searches," it has explicitly been recognized that certain third parties may validly consent to the inspection of premises or effects of an absent nonconsenting defendant if such third parties share with the defendant "common authority over or other sufficient relationship to the premises or effect sought to be *Page 1347 
inspected." United States v. Matlock, 415 U.S. 164,94 S.Ct. 988, 39 L.Ed.2d 242. See also Myers v. State, 55 Ala. App. 404,316 So.2d 235 (1975), and authorities cited therein; Hawkins v.State, Ala.Cr.App., 333 So.2d 846 (1976).
In Matlock, supra, Justice White, in footnote 7 of his opinion, clarifies what is meant by "common authority":
 "Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justified the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, see Chapman v. United States, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961) (landlord could not validly consent to the search of a house he had rented to another), Stoner v. California, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964) (night hotel clerk could not validly consent to search of customer's room) but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched."
However, when the State seeks to justify a warrantless search by proof of third party consent, they must do so by clear and convincing evidence that the consent was voluntarily and knowingly given and that the third party who gave the consent had sufficient authority to do so. Moffet v. Wainwright,512 F.2d 496 (5th C.A. 1975); Bumper v. North Carolina,391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797; Frazier v. Cupp,394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684; United States v. Matlock, supra. The issue before us now is whether the State made the requisite showing in the instant case.
The only evidence in the record as to the authority of the appellant's father and sister to consent to the search of the appellant's home is the testimony of Officer Ramsey, who conducted the search. The record reveals the pertinent part of Officer Ramsey's voir dire testimony as follows:
 "Q So, you went to his house and went in the house and acquired the coat and shotgun?
"A Yes, sir.
"Q Was the defendant at the house at the time?
"A No, sir.
 "Q Then, you got these from someone else other than the defendant?
"A Yes, sir.
"Q Did you have a search warrant at that time?
"A No, sir.
 "Q Do you know where in the house they were received from?
"A Yes, sir.
"Q Where?
"BY MR. VALESKA:
 "Judge, wait a minute. We object to this. He wants to take the witness on voir dire as to the confession. Now, he is going into how he got the evidence.
"BY THE COURT:
"Might save some time. Go ahead with voir dire.
"BY MR. PALUGHI:
 "Q You didn't get these objects from the defendant, did you?
"A No, I did not.
 "Q You did not get them the same time you arrested the defendant?
"A No, I did not.
"Q When did you get these objects?
"A Before I arrested him.
"Q How many minutes — how many days, weeks or what?
"A About thirty or forty minutes.
 "Q The defendant was not home? Do you know where in the house these objects came from?
"A Yes, sir.
"Q Where? *Page 1348 
"A Bedroom.
"Q Do you know whose bedroom?
"A According to his father, it was his bedroom.
"Q You had no search warrant?
"A No.
 "Q Is it not a fact you told the father to give up these things or you would get a search warrant or something to that effect?
"A No, sir.
"Q How did he give them to you?
 "A We asked him permission and also, I believe it was the defendant's sister for permission. There were several people there. We wanted to know who was in charge of the house and his father was there and they give us permission to search.
 "Q Now, at that point did you know that that room that it came from was his bedroom?
"A They told us that."
The appellant's father and sister, whose consent Officer Ramsey relied upon, did not testify at trial.
We do not feel that the State has sustained its burden of showing that the father and sister had proper dominion over the premises searched. Not only was the address of the premises not disclosed in the record, but the State never established whether the father or sister owned the premises, who had title, whether they lived there as joint tenants sharing common authority over it with the appellant, or were simply houseguests of the appellant. Although officer Ramsey inquired as to "who was in charge," the record does not clearly indicate that he ever got a response to his question other than, "his father was there and they give us permission to search." Assuming arguendo that the father told Officer Ramsey emphatically that he was in charge of the premises and had authority to consent to the search, this authority cannot be proven at trial solely by the hearsay testimony of the officer who conducted the search. Moffet v. Wainwright, supra. We therefore conclude that the coat and the .410 shotgun obtained from the appellant's bedroom were erroneously admitted into evidence, but in view of the relevant facts and circumstances as presented by the entire record, their admission into evidence was harmless in that the substantial rights of the appellant were not affected thereby. Rule 45, Alabama Rules of Appellate Procedure, adopted December 1, 1975.
The record reveals that neither ownership, nor the use of the coat and .410 shotgun by the appellant were "disputed evidentiary facts" in the instant case, but, to the contrary, these facts were admitted by the appellant, not only in his statement given to Sergeant White the day after the shooting, but also by his own testimony at trial. Boulden v. State,278 Ala. 437, 179 So.2d 20; Chandler v. State, 283 Ala. 29,214 So.2d 306; Jones v. State, 50 Ala. App. 36, 276 So.2d 621.
We therefore feel that the admission of the appellant's gun and coat, without the proper showing of ownership of the premises, did not necessarily contribute to the verdict reached, and thus their admission was harmless beyond a reasonable doubt. Chapman v. State of California, 386 U.S. 18,87 S.Ct. 824, 17 L.Ed.2d 705; Chambers v. Maroney, 399 U.S. 42,90 S.Ct. 1975, 26 L.Ed.2d 419; Harrington v. California,395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284; Adair v. State,51 Ala. App. 651, 288 So.2d 187, and authorities therein cited.
 II
The appellant also contends that the trial court erred in admitting into evidence his signed statement given to Sergeant White because Sergeant White did not include within the statement the questions which elicited the testimony contained therein. The record reveals that the statement was prepared by Sergeant White by his asking the appellant pertinent questions, and then transcribing in narrative form only the testimony given by the appellant. Although the inclusion of the "questions *Page 1349 
asked" of an appellant in his statement may be the better practice, such is not necessary, and our concern focuses on whether or not the statement was voluntarily given by the appellant after being fully informed of his rights underMiranda.
It appears in the record that the trial court heard evidence outside the presence of the jury as to the voluntariness of the statement and also evidence relating to the Miranda warning given to the appellant. Moreover, the appellant's own testimony established that he had read the statement he had given to Sergeant White, and when asked by the district attorney, "Is there anything in there [the statement] that is not true," the appellant responded, "Everything in there happened. Everything in there happened" [R. 133]. We therefore conclude that the appellant's statement was properly admitted into evidence for the jury's consideration. Shewey v. State, 48 Ala. App. 730,267 So.2d 520; Bills v. State, 49 Ala. App. 726, 275 So.2d 706;McClendon v. State, 54 Ala. App. 327, 307 So.2d 723; Retowsky v.State, Ala.Cr.App., 333 So.2d 193.
 III
As a final insistance of error the appellant contends that the State failed to establish that the appellant's action was the actual cause of Ervin Lee Black's death and alleges that the negligence of the hospital staff was the supervening cause of his death.
We find that this contention is wholly without merit. Not only does the appellant fail to offer any evidence in support of his allegation, but the testimony of Dr. Hassel was sufficient evidence upon which the jury could find that death resulted from the shotgun wound inflicted by the appellant.Cook v. State, 43 Ala. App. 304, 189 So.2d 595 (1966); Mitchellv. State, 43 Ala. App. 427, 191 So.2d 385 (1966); Gurley v.State, 36 Ala. App. 606, 61 So.2d 137 (1952); McCall v. State,262 Ala. 414, 79 So.2d 51; Adams v. State, Ala.Cr.App.,335 So.2d 398 (1976), cert. denied July 30, 1976, Ala.,335 So.2d 400.
We have carefully examined this record and find no error therein. The judgment below is due to be and the same is hereby
AFFIRMED.
All the Judges concur except CATES, P.J., not sitting.