The appellant, Audrey Marie Hilley, was convicted June 8, 1983, for the murder of her husband and the attempted murder of her daughter. She was sentenced to a term of life imprisonment for murder and a term of twenty years' imprisonment for attempted murder. On April 23, 1985, the Court of Criminal Appeals affirmed both convictions. See, Hilley v. State,484 So.2d 476 (Ala.Crim.App. 1985). This Court granted appellant's petition for writ of certiorari, and we now affirm both convictions.
The bizarre facts of this case show that on May 19, 1975, Frank Hilley, who was the husband of the appellant, first consulted a doctor for nausea and tenderness of the abdomen. He was hospitalized on May 23, 1975, and died in the early morning hours of May 25, 1975. An autopsy revealed hepatitis, swelling of the kidneys and lungs, bilateral pneumonia, and an inflammation of the stomach and duodena. The cause of death was determined to be "infectious hepatitis." No test for arsenic poisoning was conducted at that time. The appellant collected over $31,000 of life insurance proceeds as a result of the death of her husband.
On July 27, 1978, the appellant purchased a life insurance policy on the life of Carol Hilley, the appellant's teenage daughter, and named herself as beneficiary. *Page 487 
The policy, with a $25,000 face value and $25,000 of accidental death coverage, became effective in August 1978.
In April 1979, Carol Hilley began experiencing severe nausea. She was treated numerous times between April and August of 1979, and was hospitalized on August 22, 1979. During the time of Carol's sickness, the appellant gave Carol at least three injections, supposedly to relieve her nausea and to help her legs. The appellant told Carol that she had acquired the medication from Doris Ford, a friend who was a registered nurse, and told Carol not to tell anyone about the injections because Doris Ford could lose her job if others learned about them. Doris Ford testified that she had never procured any medication for the appellant to give to Carol.
Carol's health grew steadily worse. The appellant took Carol out of Carraway Methodist Hospital on September 18, 1979, and had her admitted to UAB Hospital on September 19, 1979. By this time, Carol experienced severe nausea, numbness of the hands and feet, nerve palsy, and a loss of deep tendon reflexes.
At UAB, Dr. Brian Thompson diagnosed Carol's illness as arsenic poisoning. Subsequent tests revealed high levels of arsenic in her hair. Carol's health improved steadily after this date.
On September 19, 1979, the same day Carol had been admitted to UAB, and just before the arsenic was discovered in Carol, the appellant was arrested in Birmingham on "bad check" charges. She was transported to the Anniston City Jail and was incarcerated there for approximately the following two months.
On October 3, 1979, the body of Frank Hilley was exhumed so that tests for arsenic could be performed. High levels of arsenic were found in his body, and Dr. Joseph Embry of the Alabama Department of Forensic Sciences concluded that the cause of death was acute arsenic poisoning, and not hepatitis. Expert testimony at trial revealed that symptoms of hepatitis are similar to those of arsenic poisoning.
On October 6, 1979, Frieda Adcock, the sister of Frank Hilley, found a medicine vial in an open cosmetic case among certain of the appellant's belongings that had been left at the house of Adcock's mother. Adcock turned the bottle over to the Anniston police, who in turn transferred it for scientific analysis. The bottle, which was half full of a liquid, was analyzed as containing a 1.6% solution of arsenic trioxide.
On October 9, 1979, the appellant, while still in jail on "bad check" charges, was arrested, and she was later indicted for the attempted murder of Carol Hilley. On that same day, Anniston police removed a medicine vial from the appellant's purse, which had been inventoried and stored in a personal property locker at the police station. This vial was taken for testing, and the analysis indicated the presence of arsenic.
On October 21, 1979, Frieda Adcock searched through the appellant's items that had been left in Adcock's basement, and turned several items over to the police. Upon testing, one of these items was found to be rat poison, which contained a 1.5% concentration of arsenic trioxide.
On November 9, 1979, the appellant was released on bond from the Anniston jail, but soon disappeared from Alabama. A strange sequence of events, including travel under numerous identities, consumed her next three years, until she was located by the F.B.I. in Vermont on January 12, 1983.
Evidence revealed that soon after her release on bond, she checked into a Birmingham motel under the name of Emily Stephens. She then left a note and other evidence faking her own kidnapping, and traveled to Florida under the identity of Robbi Hannon. In Florida, she met, and moved in with, John Homan. In September 1980, the appellant and John Homan moved to New Hampshire, but moved back to Florida in May of 1981. In Florida, the appellant and John Homan were married, and the appellant consequently began using the name of Robbi Homan. Sometime later, they moved back to New Hampshire.
In the summer of 1982, the appellant left New Hampshire, and traveled alone to Texas *Page 488 
and to Florida under the alias of Teri Martin. She had previously told John Homan that she had a twin sister named Teri Martin. Sometime later, she called John Homan and informed him that Robbi Homan had died and that her body had been donated to medical science in Texas.
In November of 1982, after changing her hair color and losing weight, she returned to New Hampshire, posing as Teri Martin. She and John Homan began living together again, although she still used the name of Teri Martin. They placed an obituary in a New Hampshire newspaper for Robbi Homan, and it was this obituary that tipped off a detective and eventually led to her arrest. She was arrested while working in Vermont on January 12, 1983, and was returned to Alabama.
While housed in the Calhoun County Jail awaiting trial, the appellant shared a cell with Priscilla Lang. Lang testified at trial that the appellant told her that she had poisoned her husband and her daughter with arsenic.
On June 8, 1983, the appellant was convicted of both counts in a consolidated trial. On appeal she raises nine issues regarding alleged errors at trial, but only the first two issues will be discussed in detail here.
 I.
The appellant contends that the October 9, 1979, warrantless search of her purse, and the subsequent removal of items from the purse for testing, were in violation of the Fourth Amendment of the United States Constitution.
The purse was stored in a personal property locker at the Anniston Police Department on September 20, 1979, following Mrs. Hilley's transfer from Birmingham to the Anniston jail on "bad check" charges. At least one complete inventory search of the purse was conducted there, and a list of all of the contents of the purse was prepared before storage in the locker. The purse remained in the locker until its removal on October 9. The medicine vials contained therein were then removed and turned over to the forensic laboratory at Jacksonville State University to be tested for the presence of arsenic. No search warrant was ever obtained by the Anniston Police Department for any of these activities.
The Fourth Amendment is designed "to prevent arbitrary and oppressive interference by law enforcement officials with the privacy and personal security of individuals." INS v. Delgado,466 U.S. 210, 1762, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247, 254
(1984), citing, United States v. Martinez-Fuerte, 428 U.S. 543,554, 96 S.Ct. 3074, 3081, 49 L.Ed.2d 1116, 1126 (1976). A search warrant is the protective device established to shield a person from arbitrary and oppressive interference, and all searches without a warrant are deemed "per se unreasonable" unless they fall within certain recognized exceptions to the warrant requirement. Katz v. United States, 389 U.S. 347, 357,88 S.Ct. 507, 514, 19 L.Ed.2d 576, 585 (1967); Dale v. State,466 So.2d 196, 198 (Ala.Crim.App. 1985).
The recognized exceptions to the requirement of a warrant are: (1) plain view, (2) consent, (3) incident to a lawful arrest, (4) hot pursuit or emergency situations, (5) exigent circumstances coupled with probable cause, and (6) stop and frisk situations. Dale v. State, 466 So.2d at 198; Ballard v.State, 461 So.2d 899, 903 (Ala.Crim.App. 1984); McClellan v.State, 415 So.2d 1238, 1239 (Ala.Crim.App. 1982).
Because the initial seizure of Mrs. Hilley's purse occurred during her arrest on "bad check" charges, it was valid as "incident to a lawful arrest." Consequently, the purse and its contents were in the lawful possession of the Anniston police during Mrs. Hilley's term in the Anniston jail on the "bad check" charges.
The inventory searches conducted after Mrs. Hilley's arrival at the Anniston jail were also legal. Illinois v. Lafayette,462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983).
But, while the initial seizure, the subsequent inventory search, and the continuous possession of the purse were all legal, we *Page 489 
are now faced with the issue of whether another search, conducted three weeks later because of new suspicions, was within the lawful scope of the initial search and seizure.[1] We believe that it was.
The Fourth Amendment protects only reasonable expectations of privacy. United States v. Davies, 768 F.2d 893, 902 (7th Cir. 1985). A "search," within the meaning of the Fourth Amendment, occurs only when a reasonable expectation of privacy is infringed. United States v. Jacobsen, 466 U.S. 109, 113,104 S.Ct. 1652, 1656, 80 L.Ed.2d 85, 94 (1984); United States v.Knotts, 460 U.S. 276, 280-81, 103 S.Ct. 1081, 1084-85,75 L.Ed.2d 55, 61 (1983).
Once an item has been searched, the owner's expectation of privacy in that item is significantly reduced. United States v.Burnette, 698 F.2d 1038, 1049 (9th Cir.), cert. denied,461 U.S. 936, 103 S.Ct. 2106, 77 L.Ed.2d 312 (1983); United Statesv. Guevera, 589 F. Supp. 760, 762 (E.D.N.Y. 1984); Lightbournev. State, 438 So.2d 380, 387 (Fla. 1983), cert. denied,465 U.S. 1051, 104 S.Ct. 1330, 79 L.Ed.2d 725 (1984); State v.Harden, 639 S.W.2d 90, 92 (Mo.Ct.App. 1982), cert. denied,463 U.S. 1229, 103 S.Ct. 3570, 77 L.Ed.2d 1411 (1983); People v.Rivard, 59 Mich. App. 530, 533-34, 230 N.W.2d 6, 8 (1975). "The contents of an item previously searched are simply no longer private." Burnette, 698 F.2d at 1049.
Requiring a warrant for a subsequent search of an item which has already been lawfully searched would not provide any additional protection for an individual's privacy interests,Burnette, 698 F.2d at 1049, n. 25, and would be "a useless and meaningless formality." United States v. Oaxaca, 569 F.2d 518,524 (9th Cir.), cert. denied, 439 U.S. 926, 99 S.Ct. 310,58 L.Ed.2d 319 (1978).
In Burnette, supra, a suspect was arrested for robbery of a federal savings and loan association's branch office. Upon the arrest, her purse was seized and the police conducted a contemporaneous search of the purse. Later, a more thorough search was conducted at the police station, and important additional evidence was discovered. Although this second search was made without a warrant, the court held it to be legal, because the contents of the purse had already been fully exposed to the police, and the defendant's expectation of privacy was significantly reduced by the first search.
The Supreme Court provided the original basis for this line of reasoning in United States v. Edwards, 415 U.S. 800,94 S.Ct. 1234, 39 L.Ed.2d 771 (1974), and in that case analogized the situation to the "incident to a lawful arrest" exception. The case of United States v. Guevera, supra, follows this reasoning and further supports our position in the present case.
Likewise, in United States v. Grill, 484 F.2d 990 (5th Cir. 1973), cert. denied, 416 U.S. 989, 94 S.Ct. 2396,40 L.Ed.2d 767 (1974), the defendant was arrested on drug trafficking charges and was placed in jail. All of his belongings were searched, listed on a printed receipt form, and then put away in a locker. One month later, the police searched these personal effects and removed a key from a sealed envelope, this being done without a warrant. The police then tried the key in a brass lock securing a duffel bag which had been found in the Bahamas. The key opened the lock, and the defendant was convicted on charges concerning this duffel bag.
The court held this warrantless search to be legal, and stated as follows:
 "The underpinning of these cases is that the items in question have been exposed to police view under unobjectionable circumstances, so that no reasonable expectation of privacy is breached by an officer's taking a second look at matter with respect to which expectation of privacy already has been at least partially dissipated." *Page 490 
Therefore, on the basis of the Burnette and Grill rationale, we believe the initial seizure of the purse in Birmingham and the subsequent inventory search of the purse in Anniston, both of which were indisputably lawful, severely dissipated any reasonable expectation of privacy that Mrs. Hilley may have had in her purse. Consequently, no reasonable expectation of privacy was infringed, and the Fourth Amendment did not provide Mrs. Hilley with impenetrable protection from the subsequent search by the police. We find that the trial court did not err in allowing the results of this search into evidence.
 II.
The appellant contends that the search by the police into containers delivered to them by Frieda Adcock was in violation of the Fourth Amendment. The record reflects that Adcock found these items on her own and turned them over to the police for further analysis. Some of these items were found by Adcock in the basement of her own house, and others were found by Adcock in her mother's house. The record reveals that Frieda Adcock had her own set of keys to her mother's house and had complete and unlimited access to that house.
The Fourth Amendment proscribes only governmental action and does not apply to a search or seizure — even an unreasonable one — conducted by a private individual, unless that person is acting as an agent of the government or with the participation or knowledge of a governmental official. United States v.Jacobsen, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656,80 L.Ed.2d 85, 94 (1984); Burdeau v. McDowell, 256 U.S. 465, 475,41 S.Ct. 574, 576, 65 L.Ed. 1048, 1051 (1921). Even "[a] wrongful search or seizure conducted by a private person does not violate the Fourth Amendment." United States v. Black, 767 F.2d 1334, 1339
(9th Cir. 1985); Singleton v. State, 48 Ala. App. 157, 160,262 So.2d 772, 775 (1971), cert. denied, 288 Ala. 751,262 So.2d 776 (1972).
Mere antecedent contact between Frieda Adcock and the police did not make Adcock an agent of the police. United States v.Lambert, 771 F.2d 83, 89 (6th Cir. 1985); United States v.Coleman, 628 F.2d 961, 965 (6th Cir. 1980). Rather, to make a person an agent of the police in this context, two facts must be shown.
First, the police must have instigated, encouraged, or participated in the search. Second, the individual must have engaged in the search with the intent of assisting the police in their investigation. Lambert, 771 F.2d at 89; Black, 767 F.2d at 1339; United States v. Howard, 752 F.2d 220, 227 (6th Cir. 1985).
The record in this case fails to show that the police, or any governmental agency, "instigated, encouraged, or participated in the search." Lambert, supra. It is, therefore, unnecessary to determine Frieda Adcock's intent in making her individual search. This search was conducted solely by a private individual and was not violative of the Fourth Amendment, and the police consequently gained lawful possession of the items in question.
Also, the scientific analysis of the items by the police was not a Fourth Amendment violation. It appears from the record that Frieda Adcock possessed "common authority over or other sufficient relationship to the premises or effects sought to be inspected." United States v. Matlock, 415 U.S. 164, 171,94 S.Ct. 988, 993, 39 L.Ed.2d 242, 250 (1974); United States v.Bilanzich, 771 F.2d 292, 296 (7th Cir. 1985), citing Matlock;Ballard v. State, 461 So.2d 899, 903 (Ala.Crim.App. 1984), citing Matlock. If one subjects his property to the exclusive or joint control of another, he assumes the risk that consent will be granted by the other to a search of the property.Matlock, supra; United States v. Falcon, 766 F.2d 1469, 1474
(10th Cir. 1985).
Therefore, we hold that Frieda Adcock had the requisite authority to validly consent to the testing of these items. A search conducted pursuant to a valid consent *Page 491 
is constitutionally permissible. Schneckloth v. Bustamonte,412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854, 860 (1974).
When a search is properly authorized by consent, its scope is governed by the terms of its authorization. Walter v. UnitedStates, 447 U.S. 649, 656-57, 100 S.Ct. 2395, 2401,65 L.Ed.2d 410, 417 (1980); United States v. Rackley, 742 F.2d 1266, 1271
(11th Cir. 1984). Frieda Adcock plainly authorized and consented to a search of these items by means of a full scientific analysis.
This issue is strikingly similar to the major issue decided in the case of State v. von Bulow, ___ R.I. ___, ___,475 A.2d 995, 1012-20, cert. denied, ___ U.S. ___, 105 S.Ct. 233,83 L.Ed.2d 162 (1984). While the holding in von Bulow seems to directly contradict the result we reach today, von Bulow was decided primarily on Rhode Island state law grounds and is in no way controlling in the present case. Furthermore, it involved a state search which not only exceeded the scope of the private search, but also exceeded the scope of the consent given for the state search.
The appellant argues that the plurality opinion in Walter v.United States, supra, precludes the finding that the state search was legal. However, the case at bar is distinguishable from the facts of Walter because "Walter did not involve a consent search and seizure." United States v. Falcon,766 F.2d 1469, 1475 (10th Cir. 1985). In the present case, Freida Adcock had the authority to possess and control the items and could rightfully consent to a complete scientific analysis, whereas, the third party in Walter never had rightful possession or control of the pornographic films involved in that case and could not properly consent to an expansive search of them.
Because the initial search and seizure by Adcock was a private one outside the realm of the Fourth Amendment, and because Adcock consented to a full scientific analysis of the items, the testing was legal. Accordingly, the subsequent admission of the results of the search and the scientific test was not error.
As to the other seven alleged errors, we believe the Court of Criminal Appeals has decided each issue correctly, and we adopt its holding on each of these issues. However, as to Issue VII, concerning the denial of the defendant's motion for discovery of her own recorded statement, we feel that we need to point out that Rule 18.1, Temporary Alabama Rules of Criminal Procedure, had not become effective as of the date of the denial of her motion. Therefore, Mrs. Hilley did not have the right to discovery of her statement, whereas she may have had the right if Temporary Rule 18.1 had been in effect at that time.
The judgment of the Court of Criminal Appeals is affirmed.
AFFIRMED.
TORBERT, C.J., and MADDOX, FAULKNER, JONES, ALMON, SHORES, BEATTY and HOUSTON, JJ., concur.
ADAMS, J., not sitting.
[1] For excellent discussions of this issue and various case citations on the subject, see: 2 LaFave, Law of Search andSeizure, § 5.3 (b) (1978); Note, The Inventory Search and theArrestee's Privacy Expectation, 59 Ind.L.J. 321 (1984).