John Douglas Cowart was charged by indictment with capital murder, in violation of § 13A-5-40(a)(2), Code of Alabama 1975. The petit jury found the appellant guilty of the lesser-included offense of felony murder, in violation of §13A-6-2(a)(3), Code of Alabama 1975. The trial judge thereafter sentenced the appellant to life imprisonment in the penitentiary.
During the late hours of July 21 or the early morning hours of July 22, 1988, Jimmy "Jimbo" Holcomb and this appellant left the Southside area in Birmingham, Alabama, and drove to John Park's home in Ensley, Alabama. At about 2:00 a.m. on July 22, 1988, Park's landlady, Emma Jean Brown, let two men in who asked to see Park. The appellant admitted that he and Holcomb went to Park's home at about that time.
Sometime after 2:00 a.m., Holcomb, the appellant, and Park got into Holcomb's automobile and went back to the Southside area. The appellant testified that he was not feeling well, so he climbed into the back seat and "passed out." He stated that he was awakened sometime later by Holcomb and that when he awoke he and Holcomb were at Laura Whitney's apartment, where the appellant was "staying" at the time. The appellant testified that Park was not in the automobile and that he did not know Park had been killed until later that day when he was arrested.
At approximately 6:00 a.m. on July 22, 1988, Park's body was found in an alleyway near Overlook Apartments in the Southside area of Birmingham. He had stab wounds in both the front and back of his upper torso. He also had a long cut mark across the throat and neck area. Dr. Gary Thomas Simmons testified that he performed an autopsy on Park and determined that he had died as a result of these wounds.
Contrary to the appellant's claim that he did not kill or rob Park, the State produced overwhelming evidence that he did. Specifically, Laura Whitney, with whom the appellant was staying at the time of Park's death, and John Bowlen, a cellmate of the appellant's in the Jefferson County jail, both testified that the appellant told them that he killed John Park. Both Whitney and Bowlen further testified that the appellant told them that he cut Park's throat and stabbed him in the back and chest and took $7 from Park. Bowlen also stated that the appellant told him that he took a watch and a necklace from Park.
 I
The appellant first contends that a knife which was taken from his athletic bag in Laura Whitney's apartment was obtained by means of an unreasonable and unconstitutional search and seizure. Thus, he argues that the knife should have been suppressed by the trial judge.
Prior to trial, the appellant moved to suppress the knife. A pre-trial hearing was held on his motion. Sergeant Donald Reynolds, with the Birmingham Police Department, testified that, after he arrested the appellant on July 22, 1988, he went to Laura Whitney's place of employment, Sunday in the Park, in Birmingham, Alabama. He introduced himself to Whitney, and the two stepped outside and began talking. Sergeant Reynolds stated that Whitney seemed nervous, so he asked her if she would like to go to her apartment and talk further. She indicated that she would.
When they got to Whitney's apartment, Whitney invited Sergeant Reynolds inside. While he was sitting in her apartment, Sergeant Reynolds noticed a red athletic bag lying on the floor at the end of the couch. He stated that the bag was open but that he could not see inside. He asked Whitney whose bag it was. According to Sergeant Reynolds, she responded, "It's mine and John's." (R. 14A.)
Sergeant Reynolds testified that he got up from his chair, walked over to the bag, and looked down into it. He claimed that he could see items in the bag but that he could not discern what those items were, so he picked the bag up and set it on the couch. Sergeant Reynolds stated that, when he did this, he saw a knife in the bag. He asked Whitney to whom the knife belonged, *Page 3 
to which she responded, "I don't know" (R. 15A), but claimed that it was not hers. Sergeant Reynolds took the knife into his custody at that time.
Laura Whitney also testified at the suppression hearing. She admitted that on July 22, 1988, she told Sergeant Reynolds that the athletic bag belonged to both her and the appellant. She claimed at the hearing, however, that this was not the truth, i.e., that the bag was not hers. She stated that she thought the bag was open at the time Sergeant Reynolds looked into it, even though she had previously told defense counsel that she "unzipped" it for Sergeant Reynolds.
Whitney testified that both she and Sergeant Reynolds looked into the bag and that she opened the mouth of the bag wider so that they could see inside. She claimed that she had seen the appellant with the knife on previous occasions at his cousin's house and stated that she saw him cleaning it at his cousin's house on the day before the murder.
The appellant, at trial, testified that the athletic bag was his. He stated that he had it at Whitney's apartment to keep his clothes and personal effects in. He denied, however, that the knife was his.
Warrantless searches and seizures are "per se unreasonable."Ex parte Hilley, 484 So.2d 485, 488 (Ala. 1985), citing Katz v.United States, 389 U.S. 347, 357, 88 S.Ct. 507, 514,19 L.Ed.2d 576, 585 (1967). To validate the seizure of one's person or property by such means, the search and seizure must fall within one of the well-recognized exceptions, which are: (1) plain view; (2) voluntary, intelligent, and knowing consent; (3) incident to a lawful arrest; (4) hot pursuit or emergency situations; (5) exigent circumstances coupled with probable cause; and (6) stop and frisk situations. Hilley,484 So.2d at 488, and citations contained therein. See also Scott v. State,337 So.2d 1342, 1346 (Ala.Cr.App. 1976).
The trial judge, in his order denying the appellant's motion to suppress, based his findings on three grounds: (1) the "apparent authority of [the] consenting party" to look in the athletic bag; (2) the authority of Whitney to consent to the entrance of her apartment by Sergeant Reynolds, which led to the discovery of the knife, comparing United States v. Block,590 F.2d 535 (4th Cir. 1978); and (3) the "plain view" of the seized evidence. (R. 1059-60.)
In United States v. Matlock, 415 U.S. 164, 94 S.Ct. 988,39 L.Ed.2d 242 (1974), the Supreme Court held that a third-party may consent to the search of an accused's premises or personal effects where that third-party has "common authority" over the item or the area to be searched. The Court, however, left unanswered whether police officers can rely on the "apparent authority" of the third party where that person claims to have "common authority" but, in fact, does not. See also Hilley v.State, 484 So.2d 476, 481-82 (Ala.Cr.App.), aff'd,484 So.2d 485 (Ala. 1985) ("rightful control").
Recently, the United States Supreme Court addressed this query in Illinois v. Rodriguez, ___ U.S. ___, 110 S.Ct. 2793,111 L.Ed.2d 148 (1990). In Rodriguez, a former companion of Rodriguez, who had previously resided with him, accompanied the police to his apartment. She admitted the police with a key that she had in her possession. She told the police that the apartment was "ours" and that she kept her clothes and furniture there. In fact, none of this was true; rather, she had not lived in the apartment for some time and had no real authority to enter without Rodriguez's consent.
Nonetheless, the police in Rodriguez entered the apartment with the third-party's consent and under the belief that she had the authority to consent. Justice Scalia, writing for the majority, noted that the third-party would have failed the "common authority" test of Matlock. Justice Scalia, in so holding, set out the following standard to be applied in determining whether the police "reasonably" relied on the assertions of the third-party that he or she had the "common authority" as required by Matlock: *Page 4 
 "As Stoner [v. California, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964)] demonstrates, what we hold today does not suggest that law enforcement officers may always accept a person's invitation to enter premises. Even when the invitation is accompanied by an explicit assertion that the person lives there, the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry. As with other factual determinations bearing upon search and seizure, determination of consent to enter must 'be judged against an objective standard: would the facts available to the officer at the moment . . . "warrant a man of reasonable caution in the belief" ' that the consenting party had authority over the premises? Terry v. Ohio, 392 U.S. 1, 21-22
[88 S.Ct. 1868, 1879-1880, 20 L.Ed.2d 889] (1968). If not, then warrantless entry without further inquiry is unlawful unless authority actually exists. But if so, the search is valid."
Rodriguez, ___ U.S. ___, 110 S.Ct. 2793, 111 L.Ed.2d 148
(1990).
In the cause sub judice, Sergeant Reynolds was warranted in relying on Whitney's claim of "common authority" over the athletic bag. The bag was in Whitney's apartment, at the end of Whitney's couch in her living room, and, as the trial judge noted in his order, the bag was open for all to see its contents. See Ramires v. State, 492 So.2d 615, 620-21
(Ala.Cr.App. 1985), cert. quashed (Ala. 1986), quoting UnitedStates v. Salvucci, 448 U.S. 83, 105-06, 100 S.Ct. 2547,2561-62, 65 L.Ed.2d 619 (1980) (the appellant must show that the object was not "in a place from which he could not reasonably expect to exclude others or put the object in plain view").
When asked to whom the bag belonged, Whitney told Sergeant Reynolds that it was "mine and John's." (R. 14A.) When Sergeant Reynolds picked the bag up and placed it on the couch, it was Whitney who opened the bag wider so that she and Reynolds could better view its contents. See Hilley, 484 So.2d at 490 (leaving property in joint control of another, a person assumes the risk that he or she will consent to the search of that property).
The fact that Whitney denied the bag was hers at the suppression hearing does not change the outcome. The test of "reasonableness" of the searching officer is to be viewed as of the time of the search. See United States v. Sells,496 F.2d 912, 914 (7th Cir. 1974) (police reasonably relied on defendant's employee's consent to search premises).
The appellant argues, however, that Sergeant Reynolds's mindset at the time he found the knife was one of caution regarding what Whitney told him. Sergeant Reynolds testified that he was not sure if he should believe what Whitney told him. This feeling, however, seemed to be directed at Whitney's knowledge of the crime and not ownership of the bag. Cf. Rileyv. Gray, 674 F.2d 522, 528-29 (6th Cir.), cert. denied,459 U.S. 948, 103 S.Ct. 266, 74 L.Ed.2d 207 (1982) (reliance by police on third party's consent to search held unreasonable).
The appellant also urges us to adopt United States v. Gilley,608 F. Supp. 1065 (S.D.Ga. 1985), as controlling authority in this case. In Gilley, the police officer entered the third-party's apartment with her consent to search. Upon entering, the appellant and his co-defendant were found to be in possession of marijuana, which was in "plain view" of the officer. A gray cloth travel bag was lying on the living room floor. The police officer unzipped the bag and found other incriminating evidence (cocaine and drug paraphernalia).
Gilley, however, is distinguishable from the cause sub judice. The appellant in the present cause was not present when the athletic bag was found and searched. Further, the bag was left open in a common area of Whitney's apartment, where anyone who passed by was free to view its contents. The degree of privacy afforded in Gilley does not exist here. See Jackson v.State, 414 So.2d 1014, 1020-21 (Ala.Cr.App. 1982), quotingSchneckloth v. Bustamonte, 412 U.S. 218, 222, 93 S.Ct. 2041,2045, 36 L.Ed.2d 854 (1973) (person in control *Page 5 
of premises may consent to search). See also Block,590 F.2d at 541 (police were given valid consent to search appellant's mother's premises but were not given valid consent to search a locked footlocker where the appellant stored his personal belongings); United States v. Bosby, 675 F.2d 1174, 1180 (11th Cir. 1982) (warrantless search of "closed" container is improper absent exigent circumstances).
Another factor which we deem to be important to our analysis and conclusion is that the appellant was a temporary guest in Whitney's apartment. The appellant testified that he had been staying with Whitney for three days when he was arrested. Sergeant Reynolds was in the apartment with the true tenant's permission and searched the bag under the "reasonable" belief that she was its joint owner. See King v. State,521 So.2d 1042, 1045 (Ala.Cr.App. 1987), cert. denied, 521 So.2d 1050
(Ala. 1988); McLoyd v. State, 390 So.2d 1115, 1116
(Ala.Cr.App.), cert. denied, 390 So.2d 1121 (Ala. 1980);Jackson, 414 So.2d at 1020.
Moreover, even if the State failed to prove that the knife was properly seized, its admission into evidence constituted harmless error, since it "did not necessarily contribute to the verdict reached." Scott, 337 So.2d at 1348. Testimony at trial revealed that the knife blade had a spot of blood on it, but the amount was too insignificant to either type or classify (as human or as animal blood). Furthermore, comparisons of the knife to the victim's wounds were inconclusive. The forensic expert who made the comparisons was unable to say that this knife was the murder weapon. Thus, this evidence was harmless, in light of the overwhelming evidence introduced at trial which established this appellant's guilt.
In adopting the Rodriguez analysis for the warrantless search of personal effects, as well as premises, where the search occurred under a "reasonable" belief of "apparent authority" of a consenting third-party, we are not required to address the trial court's finding that the knife was seized in "plain view" or the other arguments raised by this appellant. See Mead v.State, 449 So.2d 1279, 1280 (Ala.Cr.App. 1984) (a ruling correct for any reason will not be reversed).
The appellant, therefore, is not entitled to a reversal on this issue.
 II
The appellant next argues that the court erred in admitting the testimony of three witnesses who testified that a couple of days before the murder of John Park this appellant threatened to rob another person.
On July 20, 1988, several people gathered at the home of Debra Patterson in Ensley, Alabama. Among these people were Laura Whitney and this appellant. Patterson and Eddie Larison were also present. Larison, Patterson, and Whitney all testified at trial, over the appellant's objection, to the alleged "threats" made by this appellant.
All three witnesses testified that several people were sitting around and talking about various things. During their discussions, the subject of money was brought up (specifically, the fact that none of them had any). At this time, according to the witnesses, the appellant made the threats.
Larison testified that the appellant stated "[t]hat he knew this guy that he wanted to roll [who] had a lot of money and jewelry." (R. 456, 467.) Larison, on cross-examination, stated that he thought the appellant was joking. He also stated that he understood that the appellant wanted the girls to go to bed with this person and then rob him. He stated that he "guess[ed]" that this is what the appellant meant by "rolling the guy." (R. 470.)
Patterson testified that the appellant said "[t]hat he knew this guy that we could go rob and it would be easy money." (R. 477.) She also recalled the appellant saying that this person was an older man with a lot of money and was a "fag." (R. 477.) She, like Larison, stated that she thought the appellant was joking.
Whitney testified that the appellant was trying to talk some members of the group into going with him to "knock [this person] *Page 6 
off." (R. 519.) She claimed that he said that "it would be pretty easy" and that they could "roll him." (R. 519.) She, too, testified that she thought that the appellant was joking.
The trial judge, in denying the appellant's motion to exclude and overruling his objection to the evidence of the prior threats, based his decision on § 44.02 of McElroy's. That section reads, in relevant part, as follows:
 "In a charge of homicide or assault, a threat by the accused to kill or injure the victim is admissible as tending to show a design in the accused to commit the crime and, hence, as tending to show his commission of the crime. Some courts have held such threats admissible as tending to show malice or intent on the part of the accused. The remoteness of the threat by the accused would appear to have no effect upon its admissibility. The threat is admitted no matter how much time has elapsed between it and the homicide or assault.
". . . .
 "A threat which was not directed toward the victim is not admissible in a present criminal prosecution. A vague threat, for example, against no person in particular is not admissible against the accused unless accompanied by evidence warranting an inference that the threat was directed against the victim. Although the victim is not named in the threat, if the evidence of other circumstances warrants an inference that it was directed against the victim or a class of which the victim was a member, then the threat is admissible."
C. Gamble, McElroy's Alabama Evidence § 44.02(1) (3d ed. 1977) (footnotes omitted).
Prior to the introduction and admission of the challenged testimony, the State presented evidence that the victim wore a substantial amount of jewelry (two gold necklaces, a gold watch with a leather band, and a diamond ring) and that he was a homosexual. This evidence provides a sufficient inferential nexus that the person to whom the threats were directed was John Park, the victim in this case. See Cogman v. State,424 So.2d 1355, 1357-58 (Ala.Cr.App. 1982), cert. denied (Ala. 1983) (previous threat to rape victim); Brooks v. State, 45 Ala. App. 196,201-02, 228 So.2d 24 (1969) (the appellant stated that "he was going to get one of the city councilmen").
Admission of this testimony was not error. Therefore, the appellant is not entitled to a reversal on this basis.
 III
The appellant's final contention is two-fold. First, he argues that the State's rebuttal witness, John Bowlen, was a State informant. Second, he argues that evidence of statements allegedly made by him to Bowlen while the two men were incarcerated in the Jefferson County jail should not have been allowed into evidence.
Bowlen testified that he was placed in the Jefferson County jail for escape in February 1989. On February 28, 1989, he met this appellant. He claimed that they "kind of hit it off right from the start." (R. 741.)
Bowlen testified that the appellant initially told him that he did not kill John Park. According to Bowlen, the appellant told him that he, Holcomb, and the victim were all riding in the car and that he fell asleep in the back seat. The appellant told him that he was arrested the next day.
Bowlen stated that the appellant later told him that the police found a knife in his bag. Bowlen claimed that the appellant said his fingerprints were on the knife and that there was blood on it, but that the appellant claimed Holcomb had placed the knife in his bag.
Bowlen then testified that the appellant changed his story a few days later and admitted that he killed Park. According to Bowlen, the appellant "broke down" at this time and started crying.
Bowlen stated that three days after the appellant confessed to him, on or about March 5, 1989, he telephoned the district attorney's office and spoke with a female assistant district attorney. He told her that he had information from this appellant about the murder of Park. *Page 7 
On or about March 7, 1989, Bowlen was contacted by Assistant District Attorney Bob McGregor, who prosecuted this case, and Teresa Pulliam, another assistant district attorney in Jefferson County, Alabama. Bowlen testified that both district attorneys told him that they could not make him any promises based on his knowledge of Park's murder. At that time, he told them that the appellant confessed to him that he had killed Park. According to Bowlen, McGregor asked if he would agree to give a taped statement to an investigator and if he would be willing to testify. He responded affirmatively to both questions.
Bowlen then sought to testify about additional information that he received from the appellant regarding his participation in the murder of John Park. The appellant, at this point, objected, arguing that Bowlen became an agent for the State following his contact with McGregor and Pulliam on or about March 7, 1989.
A hearing was held on his objection, outside the presence of the jury, and at that hearing defense counsel took Bowlen on voir dire examination. Bowlen testified that a few days later (March 17, 1989) he again met with McGregor and Pulliam. Sergeant Reynolds was also present on this occasion and taped his statement. Bowlen stated that the statement he gave at this time was substantially similar to the untaped statement of March 7, 1989. Bowlen stated that McGregor told him at the conclusion of his March 17 statement that he could not go back into his jail cell and initiate, on the State's behalf, further conversation with the appellant nor could he act as an agent of the State.
Nonetheless, following the March 17 statement, Bowlen discussed the case on one other occasion with the appellant. Bowlen claimed that the appellant started the conversation but that he (Bowlen) asked him questions about the crime.
As a result of this newly discovered evidence, Bowlen again contacted Sergeant Reynolds. McGregor and Sergeant Reynolds, on March 22, 1989, took another taped statement from Bowlen. Bowlen told them at this time (between March 17 and March 22, 1989,) that the appellant had told him the following concerning the killing:
 "John had told me that the victim was stabbed in the back, in the chest, and his throat was cut; and he had articles [taken] from him, his billfold, watch and a necklace; and that he was killed in the car . . . and then [taken] from the car to an apartment." (R. 764.)
The appellant also allegedly told Bowlen that the victim was wearing a beeper or pager and that he and Holcomb took $7 from the victim.
Following this testimony, the trial judge heard arguments from both sides and overruled the appellant's motion and objection. In the presence of the jury, Bowlen then further testified to what the appellant told him. (R. 777-78.)
To resolve this issue, we must look at the State's reason for calling Bowlen as a rebuttal witness. The appellant, at trial, took the stand and testified. During cross-examination of the appellant by the assistant district attorney, the following occurred:
 "Q. Mr. Cowart, do you know a man by the name of John Bowlen?
"A. No, sir, I don't.
"Q. You don't? Never heard of him?
"A. No sir.
". . . .
 "Q. Are you not currently in close proximity to a man named John Bowlen, John Henry Bowlen?
"A. Yes, sir.
"Q. How long have you been around him?
"A. About a month.
"Q. Have you discussed your case with him?
"A. We discussed scenarios.
". . . .
 "Q. . . . . Have you ever told John Bowlen this or this in substance: 'I killed him,' with regard to John Park?
"A. No, sir.
 "Q. Have you ever told John Bowlen that you were charged with taking seven dollars from the man?
 "A. I may have mentioned the fact that that's what was said. Yes, sir. *Page 8 
 "Q. Have you ever told John Bowlen that the man was wearing a beeper?
"A. No, sir.
"Q. You have never told him that?
"A. No, sir.
 "Q. Have you ever told John Bowlen that you didn't do it, that you were in the back seat of the car asleep?
"A. Yes, sir, I may have.
 "Q. And after that, have you ever told him that you killed him?
"A. No, sir, I haven't.
 "Q. You told him — strike that. You say you have never told him that the man was wearing a beeper?
 "MR. LENTINE: Your Honor, I'm going to object, this is cumulative. He has asked it I don't know how many times.
"THE COURT: Overruled.
 "Q. Have you never told him that the man was wearing a beeper?
 "A. No, sir. Not to the best of my recollection, unless — I may have mentioned it since the trial has begun and I've heard about a beeper. I may have said something about it.
 "Q. I see. No further questions — but not before the trial started?
"A. No, sir." (R. 732-35.)
Assuming arguendo, that Bowlen was, in fact, acting as an agent for the State following his interview on March 7, 1989, thus rendering the information he received from the appellant thereafter "illegally obtained," the evidence would have still been admissible for impeachment or rebuttal purposes. Burks v.State, 489 So.2d 686, 687 (Ala.Cr.App.), cert. denied
(Ala. 1986), quoting United States v. Havens, 446 U.S. 620,100 S.Ct. 1912, 64 L.Ed.2d 559 (1980). In Burks, the prosecutor cross-examined the appellant regarding certain deposit slips he had filled out. As to one of the deposit slips, the appellant denied taking the deposit slip home. On rebuttal, the State called to testify a police sergeant who identified a deposit slip which was illegally seized from the appellant's home. This court held that the admission of the deposit slip for rebuttal purposes was not error. See also Hill v. State, 555 So.2d 341
(Ala.Cr.App. 1989).
In so holding, we need not address whether Bowlen acted as the State's agent or informant. But we note in passing that the appellant does not object to Bowlen's claim that the appellant told him that he (the appellant) "killed" John Park; rather, he claims that the information obtained following his March 7, 1989, statement, regarding how, what, and where was inadmissible.
The admission of Bowlen's rebuttal testimony was not error. The appellant is thus not entitled to reversal on this basis.
For the reasons stated above, the judgment of the trial court is due to be, and it is hereby, affirmed.
AFFIRMED.
All the Judges concur.