STATE of Tennessee, ex rel., Robert
SNEED, Appellant–Applicant,

v.

Charles LONG, Sheriff of Hamblin
County, Appellee–Respondent.

Supreme Court of Tennessee,
at Knoxville.

Feb. 7, 1994.

Charles W. Burson, Atty. Gen. and Report-
er Jerry L. Smith, Deputy Atty. Gen., Nash-
ville, for appellee-respondent.

Robert Sneed, pro se, with the Assistance of Greg Eichelman, Office of the Public Defender, Morristown, for appellant-applicant.

## *OPINION*

DROWOTA, Justice.

Robert Sneed appeals from the Court of Criminal Appeals' affirmance of the trial court's denial of his petition for a writ of habeas corpus in this extradition proceeding. This Court granted Sneed's application for permission to appeal to address a single issue: whether the authorities in the asylum state may, consistent with the Fourth Amendment to the United States Constitution, search an inmate's personal property that is stored in the jail property room for evidence of the crime for which extradition is sought, when the inmate was initially incarcerated for another crime and is serving a sentence for that crime. Although we affirm the Court of Criminal Appeals' ruling on this issue, we decline to adopt that Court's rationale, and instead focus on the proper role of the judiciary in extradition proceedings.

### THE FACTS

Robert Sneed was indicted for "theft by deception" in Floyd County, Kentucky. This charge was prompted by allegations that Sneed had tendered a worthless check from his business in Kingsport, Tennessee, payable to Sneed in the amount of $382.20 to the Wal–Mart store in Prestonburg, Kentucky. Sneed purportedly endorsed the check; and the store clerk verified the check with Sneed's driver's license number and his Social Security number. When Wal–Mart attempted to cash the check, however, it was informed that the account upon which the check had been written had been closed. After unsuccessfully attempting to obtain restitution, Wal–Mart brought criminal charges against Sneed, who was eventually located in the Hamblen County jail where he was serving a sentence for another bad check charge.

The State of Kentucky thereafter made a formal request for rendition to Governor McWherter; after reviewing the request, the governor issued a rendition warrant, mandating that Sneed be arrested and transported to Kentucky to stand trial on the "theft by deception" charge. Sneed resisted the rendition warrant by filing an application for a writ of habeas corpus with the Hamblen County Circuit Court; in this application, Sneed stated that he was not in Kentucky on the date the worthless check was allegedly passed, and that therefore he could not be considered a fugitive from justice. In order to rebut Sneed's claim, the Hamblen County District Attorney requested that the county jail administrator search Sneed's wallet, which was stored in the property room at the jail, to locate any items of identification bearing Sneed's signature that could be matched with Sneed's endorsement on the check. The district attorney did not obtain a search warrant prior to making this request. The jail administrator searched the wallet and found several items, including Sneed's driver's license, his Social Security card, a bank identification card, a video store rental card, and an insurance identification card, that bore Sneed's signature. The jail administrator turned these items over to the district attorney, who offered them as evidence at the extradition hearing to prove that Sneed was in fact in Kentucky on the date of the alleged offense. The trial court denied Sneed's petition for a writ of habeas corpus; Sneed appealed from this ruling to the Court of Criminal Appeals.

On appeal, Sneed argued that the warrantless search of his personal property was impermissible under the Fourth Amendment. The Court of Criminal Appeals rejected this claim, relying on the following language from the United States Supreme Court's decision in *United States v. Edwards*, 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974):

"[O]nce the accused is lawfully arrested and is in custody, the effects in his possession at the place of detention that were subject to search at the time and place of his arrest may lawfully be searched and seized without a warrant even though a substantial period of time has elapsed between the arrest and subsequent administrative processing, on the one hand, and the taking of the property for use as evidence, on the other."

415 U.S. at 807, 94 S.Ct. at 1239, 39 L.Ed.2d at 778.

The Court reasoned that because Sneed's personal property had already been legally viewed by the Hamblen County authorities pursuant to his first arrest, the subsequent search of the wallet was not unlawful. Sneed then appealed to this Court.

## ANALYSIS

Sneed argues that the Court of Criminal Appeals' decision is erroneous because *Edwards* does not, in all circumstances, sanction a search of an inmate's personal property after incarceration. In essence, Sneed insists that *Edwards* applies only to a situation where the authorities seek to reexamine an inmate's property inventoried at the time of his arrest for evidence relevant to the offense upon which the inmate is in jail awaiting trial; in this situation, Sneed says, the *Edwards* "search incident to arrest" rationale justifies a "second look" at the inmate's property because the police have already lawfully viewed the property pursuant to the arrest and the inmate thus has no legitimate expectation of privacy in the property. But, Sneed urges, the *Edwards* rationale does not allow authorities to reexamine property inventoried at the time of the arrest for evidence of some other crime because the authorities have never lawfully viewed the property with respect to the other crime. Sneed appears to suggest that the fact that he was convicted and was serving his sentence for the initial bad check charge reestablished his expectation of privacy in his wallet; and that the authorities were therefore required to secure a warrant before searching his personal property for evidence to utilize in the extradition hearing.

Sneed's argument, in the abstract, raises an interesting Fourth Amendment issue that has never been addressed by the appellate courts of this state. The precise contours of the *Edwards* decision have not been clearly established, and other jurisdictions have split on the issue of whether the State must have probable cause to search an inmate's personal property for evidence of a crime different than that for which he is incarcerated, with a majority of jurisdictions adhering to the view that no probable cause is required. *See* Wayne LaFave, Search and Seizure, § 5.3(b) (2d Ed.1987); *see e.g., Ex parte Hilley,* 484 So.2d 485 (Ala.1985) (defendant incarcerated on bad check charge later connected with arsenic poisoning; court sanctioned search of her property inventoried at first arrest because she had no reasonable expectation of privacy in the property thereafter); *but see People v. Trudeau,* 385 Mich. 276, 187 N.W.2d 890 (1971) (defendant incarcerated for burglary of a post office; court disallowed the search of his property for evidence to tie him to burglary of a synagogue on the grounds that no probable cause existed to search with respect to the second crime).

■ Notwithstanding Sneed's interesting constitutional argument, we need not approve or reject the Court of Criminal Appeals' treatment of this issue; rather, we must base our decision on procedural considerations peculiar to extradition proceedings which are logically prior to the constitutional issue. Extradition proceedings are, and have always been, summary proceedings of a civil nature designed to test whether the rendition warrant[1], the legal process issued by the governor of the asylum state which mandates that the defendant be arrested and turned over to agents of the demanding state, is valid. *See* Tenn.Code Ann. § 40–9–119; *South Carolina v. Bailey,* 289 U.S. 412, 53 S.Ct. 667, 77 L.Ed. 1292 (1933); *Biddinger v. Commissioner of Police,* 245 U.S. 128, 38 S.Ct. 41, 62 L.Ed. 193 (1917); *United States ex rel. Vitiello v. Flood,* 374 F.2d 554 (2d Cir.1967). As such, the extradition hearing is factual in nature and is limited to these inquiries: 1) whether the extradition documents are valid on their face; 2) whether the petitioner has been substantially charged with a crime in the demanding state; 3) whether the petitioner is the person named in the request for extradition; and 4) wheth-

---

1. The issuance of a rendition warrant creates a prima facie case that the extradition is valid, and the person seeking to resist extradition bears the burden of proving beyond a reasonable doubt that he is not the person sought to be extradited. *State v. Whitt,* 753 S.W.2d 369 (Tenn.Crim.App. 1988).

er the petitioner is a fugitive from justice. *Michigan v. Doran*, 439 U.S. 282, 99 S.Ct. 530, 58 L.Ed.2d 521 (1978); *State ex rel. Price v. Evatt*, 688 S.W.2d 97, 98 (Tenn.Crim. App.1983). Extradition proceedings are circumscribed because they are predicated upon an explicit extradition provision in the federal constitution [2] which implicates the fundamental concerns of national unity and comity between the several states. As Justice Clarke explained in *Biddinger, supra:*

> The [extradition clause was included in the federal constitution] to provide a summary executive proceeding by the use of which the closely associated states of the Union could promptly aid one another in bringing to trial persons accused of crime by preventing their finding in one state an asylum against the processes of justice of another. [citation omitted] Such a provision was necessary to prevent the very general requirement of the state constitutions that persons accused of crime shall be tried in the county or district in which crime shall have been committed from becoming a shield for the guilty rather than the defense for the innocent, as they were intended to be. Its design was and is, in effect, to eliminate, for this purpose, the boundaries of states, so that each may reach out and bring to speedy trial offenders against its laws from any part of the land.

> Such being the origin and purpose of these provisions of the constitution and statutes, they have not been construed narrowly and technically by the courts as if they were penal laws, but liberally to effect their important purpose ...

> Courts have been free to give this meaning to the constitution and statutes because in delivering up an accused person to the authorities of a sister state they are not sending him for a trial in an alien jurisdiction, with laws which our standards might condemn, but are simply returning him to be tried, still under the protection of the federal constitution but in the manner pro-

vided by the state against the laws of which it is charged that he has offended.

245 U.S. at 132–33, 38 S.Ct. at 42–43, 62 L.Ed. at 198.

■ Because of the basic purpose of extradition, and the notion that the federal constitution will serve as a "floor" to prevent the violation of the petitioner's constitutional rights in the demanding state, courts have almost uniformly refused to allow petitioners to raise constitutional issues in extradition hearings in the asylum state. This rule clearly applies to violations of the petitioner's constitutional rights allegedly committed by the demanding state. *See e.g., Michigan v. Doran, supra* (petitioner not allowed to raise issue of whether demanding state had probable cause to charge him with crime in extradition proceedings); *Sweeney v. Woodall*, 344 U.S. 86, 73 S.Ct. 139, 97 L.Ed. 114 (1952) (petitioner not allowed in extradition proceedings to raise issue of whether his confinement in prison of demanding state constituted cruel and unusual punishment); *Appleyard v. Massachusetts*, 203 U.S. 222, 27 S.Ct. 122, 51 L.Ed. 161 (1906) (petitioner not allowed to raise issue of whether the rendition documents from the demanding state, which were based on hearsay, violated his rights under the Confrontation Clause); *de la Beckwith v. Evatt*, 819 S.W.2d 453 (Tenn.Crim. App.1991) (petitioner not allowed to raise issue that amount of time that had elapsed between date of the alleged offense and his indictment violated his Sixth Amendment right to a speedy trial).

Moreover, virtually all courts also hold that a party contesting extradition through habeas corpus may not raise issues that involve possible constitutional violations committed by the asylum state. For example, in *United States ex rel. Vitiello v. Flood, supra*, the petitioner argued that his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), were violated when the trial court admitted into evidence a confession made to a police officer of the

---

2. The subject of extradition is covered by Article IV, § 2, cl. 2, which provides:

   A person charged in any State with treason, felony, or other Crime, who shall flee from Justice, and can be found in another State, shall on demand of the executive authority of the State from which he fled, be delivered up, to be removed to the State having Jurisdiction of the Crime.

asylum state for the purpose of proving that the petitioner was in the demanding state on the date of the alleged offense. After noting that all the constitutional protections of a criminal trial are not available in a extradition hearing, the Second Circuit Court of Appeals stated that the petitioner was free to raise any constitutional issues in the criminal trial in the demanding state. The Court added that if information necessary to rebut the petitioner's case in the extradition hearing was obtained by the asylum state through extreme duress or other improper conduct, the trial court could consider this in deciding the proper weight and credibility to accord the State's evidence.

Many courts have adopted the *Flood* rationale. *See e.g., Walden v. Mosley,* 312 F.Supp. 855 (N.D.Miss.1970) (petitioner not allowed to raise issue of Fourth Amendment violations by the asylum state); *North v. Koch,* 169 Colo. 508, 457 P.2d 915 (1969) (petitioner not allowed to raise issue of *Miranda* violations); *Martin v. Maryland,* 287 A.2d 823 (D.C.App.1972) (petitioner not allowed to raise issue of Fourth Amendment violations); *Commonwealth v. Kulp,* 225 Pa.Super. 345, 310 A.2d 399 (1973) (petitioner not allowed to raise issue Fourth Amendment violations); *Reeves v. Cox,* 118 N.H. 271, 385 A.2d 847 (1978) (petitioner not allowed to raise issue of *Miranda* violations); *Cobb v. Gilman,* 271 Ind. 223, 391 N.E.2d 618 (1979) (petitioner not allowed to raise issue of *Miranda* violations); *Utt v. State,* 293 Md. 271, 443 A.2d 582 (Ct.App.1982) (petitioner not entitled to Sixth Amendment right of counsel at extradition hearing). Despite its overwhelming acceptance, however, the principles enunciated in *Flood* are not unassailable, for it is true that the *Flood* rule would theoretically permit the asylum state to violate the petitioner's constitutional rights, and if any evidence garnered by the asylum state is not ultimately utilized by the demanding state in the petitioner's criminal trial, the petitioner will have endured a constitutional violation for which there is effectively no remedy. In fact, the District Court for the Northern District of Mississippi in *Walden, supra,* frankly acknowledged this possibility by stating

"[i]t is true that in the present case, since the charges [in the asylum state] against

petitioner are not being prosecuted, he may never have a chance to redress violations of his constitutional rights by exclusion of the fruits thereof as evidence at his trial. Nonetheless this court is without power to afford the petitioner another remedy.

His only possible remedy appears to be by exclusionary motion at his trial for escape in [the demanding state], the success of which is highly dubious in view of the fact that courts in demanding states generally will not review anything that happened in the asylum state prior to extradition.

312 F.Supp. at 861.

■■■ Despite the real concerns prompted by such a sweeping rule, we decline to depart from a standard that has been utilized for a long period of time by the vast majority of state and federal jurisdictions. The per se rule precluding the petitioner from raising constitutional issues at an extradition hearing has many advantages: it actively promotes the central objective of the extradition clause—to return persons for trial to the state in which they have been charged with criminal activities; it is faithful to the constitutional theory of extradition as essentially an executive proceeding; it generally promotes the concept of comity between the several states; and it conserves scarce judicial resources by limiting the scope of collateral proceedings. Moreover, despite Sneed's suggestion that we need formulate a standard only to remedy the most egregious constitutional violations by the asylum state, the task of formulating a viable alternative standard is by no means a simple one. And we believe that any truly egregious violations by the asylum state will in fact be taken into account by the trial court in its fact-finding capacity at the extradition hearing.

For the foregoing reasons, the judgment of the Court of Criminal Appeals is hereby affirmed.

REID, C.J., and O'BRIEN, ANDERSON and BIRCH, JJ., concur.