[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 478 
Audrey Marie Hilley was indicted by the grand jury of Calhoun County in October of 1979 for the attempted murder by poisoning of her daughter, Carol Hilley. In January of 1980, the grand jury returned an indictment against Hilley for the murder of her husband, Frank Hilley. These two indictments were consolidated for trial. The jury returned a guilty verdict on each charge. Subsequently appellant was sentenced to a term of life imprisonment for the murder of Frank Hilley and to a term of 20 years' imprisonment for the attempted murder of Carol Hilley.
This case involves a tragic and bizarre sequence of events. The evidence reveals that Frank Hilley, the husband of the appellant, consulted Dr. Earl Jones on May 19, 1975, complaining of nausea and tenderness of the abdomen. Dr. Jones diagnosed his condition as a viral stomach ache. When the condition persisted, he was admitted to the hospital on May 23, 1975. Based on laboratory studies indicating acute liver malfunction, Dr. Jones diagnosed Mr. Hilley's condition as infectious hepatitis. Frank Hilley died in the early morning hours of May 25, 1975, and because of the suddenness of his death, Dr. Jones requested that the appellant allow him to perform an autopsy. The autopsy revealed hepatitis, swelling of the kidneys and lungs, bilateral pnuemonia, and an inflammation of the stomach and duodena. The cause of death was determined to be infectious hepatitis; however, no test for arsenic poisoning was conducted. Later testimony revealed that the effects of arsenic poisoning and the symptoms of infectious hepatitis are in many ways alike.
Frank Hilley maintained a life insurance policy with Provident Life and Accident Insurance Company of which the appellant was the named beneficiary. Subsequent to Frank Hilley's death, the appellant received a total of $31,140 in payments on this policy.
On July 27, 1978, appellant made an application with Liberty National Life Insurance Company for coverage on Carol Hilley, her daughter. A policy for $25,000 face value and $25,000 accidental death coverage became effective in August 1978, with appellant named as beneficiary.
In April of 1979, Carol began to experience trouble with severe nausea. Between April 1979 and August 1979, she had to be taken to the emergency room and admitted for treatment a number of times. In August 1979, appellant gave Carol an injection in her hip which she claimed would alleviate Carol's nausea. After this injection, Carol, for the first time, began experiencing numbness of fingers and weakness of legs in addition to nausea, and she had to be admitted on August 22, 1979, to the Anniston hospital, by Dr. Warren Sarrell. Unable to formulate a diagnosis, Dr. Sarrell on August 29, 1979, sent Carol to see Dr. John Elmore at Carraway Methodist Hospital in Birmingham for a psychiatric evaluation. While at Carraway Methodist Hospital, Carol was administered two additional injections by the appellant, this time being told that they would improve her weak legs. Appellant also told Carol that no one was to know of these injections because the source was Doris Ford, a registered nurse, and she might lose her job if anyone were to find out. Doris Ford subsequently testified that she never gave the appellant any drugs or medicine of any kind.
On September 18, 1979, the appellant asked Dr. Elmore what was wrong with Carol. He told her she suffered from malnutrition and vitamin deficiencies and that *Page 479 
lead or other metal poisonings might be the cause. Against Dr. Elmore's recommendation, the appellant had Carol discharged the afternoon of September 18, 1979. Dr. Elmore stated that in his opinion Carol was in a worse condition than when she had been admitted.
On September 19, 1979, Carol was admitted to the University of Alabama Hospital in Birmingham. Also on that date, appellant was arrested on bad check charges. Dr. Brian Thompson, on initial examination, discovered that Carol's hands were numb, her feet were numb, she had nerve palsy causing foot drop, and she had lost most of her deep tendon reflexes. Ultimately he discovered that Aldridge Mee's Lines were present in Carol's toenails and fingernails. He testified that this was a symptom of arsenic poisoning. He conducted tests on samples of Carol's hair and discovered that it had about 50 times the normal arsenic level in human hair. He then diagnosed her condition as due to arsenic poisoning. Detailed tests on Carol's hair conducted October 3, 1979, by John Case of the Alabama Department of Forensic Sciences, revealed arsenic levels ranging from over 100 times the normal level close to the scalp to zero times the normal level at the end of the hair shaft. This indicated to him that Carol had been given increasingly larger doses of arsenic over a period of 4 to 8 months. Dr. Thompson testified that Carol's condition improved steadily while she was at U.A.B.
On October 3, 1979, the body of Frank Hilley was exhumed. H. Chip Walls of the Alabama Department of Forensic Sciences performed tests on samples taken from Frank Hilley's body. The analysis revealed abnormally high levels of arsenic, ranging from 10 times the normal level in hair samples to 100 times the normal level in toenail samples. As a result of these tests, Dr. Joseph Embry of the Alabama Department of Forensic Sciences concluded that the cause of Frank Hilley's death was acute arsenic poisoning. He noted that Frank Hilley suffered from chronic arsenic poisoning, meaning that he had been given arsenic for months prior to his death.
On October 6, 1979, Freida Adcock, Frank Hilley's sister, found a medicine vial in an open cosmetic case at Freida's mother's home in the back room in which appellant had kept her belongings during the period she had lived in the home. Mrs. Adcock turned this vial over to the Anniston Police for analysis. Analysis of the contents of this bottle by John Case of the Alabama Department of Forensic Sciences revealed the presence of arsenic.
On October 9, 1979, appellant, still being held in the Anniston City Jail on check charges, was arrested for the attempted murder by poisoning of Carol Hilley. A medicine vial in her purse, which was already in the possession of the Anniston Police, was removed for testing, and washings from the bottle revealed the presence of arsenic. On October 21, 1979, Freida Adcock removed a bottle of Cowley's rat and mouse poison from appellant's belongings stored in Freida's basement. Freida testified that the bottle was in a box of appellant's belongings stored in the basement during one of the appellant's many moves. Analysis of this bottle revealed the presence of a 1.4 to 1.5 percent arsenic solution.
On October 25, 1979, appellant was indicted for the attempted murder by poisoning of Carol Hilley. On November 9, 1979, bond was approved for appellant and she was released from jail. Less than a week after her release, appellant checked into the Birmingham Roadway Inn under the name of Emily Stephens. She made arrangements to meet with her attorney there on November 18, 1979. When he arrived she was gone. Some of her belongings were still in the room and a note indicating that she may have been kidnapped was found. She was reported missing, but evidence tended to indicate that this kidnapping was probably fabricated by the appellant.
On January 4, 1983, Detective Barry Hunter of the New Hampshire State Police began an investigation into the death of Robbi L. Homan, whose obituary had appeared *Page 480 
in the Keene Sentinel newspaper on November 13, 1982. Unable to verify any of the information in the obituary, Detective Hunter came to believe that the alleged surviving sister of Robbi L. Homan, Teri Martin, who worked at the Book Press in Battleboro, Vermont, might be a federal fugitive.
On January 12, 1983, Detective Hunter and Special Agent David Steele of the Federal Bureau of Investigation approached the suspect known to them as Teri Martin and informed her that they had reason to believe that she was someone other than who she claimed to be. She then agreed to accompany them to the police station. At the station, after being advised of her constitutional rights, she admitted that her real name was Audrey Marie Hilley and that she was wanted in Alabama on check charges and in connection with charges that she attempted to poison her daughter.
In explaining her false identity she told the officers that in late 1979, she had traveled to Florida, where she met John Homan. Eventually she began living with him and in September of 1980, they moved to New Hampshire, where she assumed the false identity of Robbi Hannon. In May of 1981, she returned to Florida with John Homan, they were married, and she began using the name Robbi Homan. They then returned to New Hampshire. Sometime late in the summer of 1982, she left New Hampshire, telling her husband that she needed to attend to family business and to see some doctors about an illness she had. During this time she travelled to Texas and Florida, using the alias Teri Martin. Before leaving on the trip, she had mentioned to John Homan that she had an identical twin sister named Teri Martin. Using the alias, Teri Martin, she called John Homan and informed him that Robbi Homan, his wife, had passed away in Texas but there was no need for him to come to Texas because the body had been donated to medical science.
Subsequently, on November 12 or 13, after changing her hair color and losing weight, she returned to New Hampshire and met John Homan, posing as Teri Martin, his "deceased" wife's sister. Thereafter, she began living with him again and began working for the Book Press, where she worked until her arrest and transportation back to Alabama to be tried on the pending charges.
While away, the appellant had been indicted on January 11, 1980, for the murder of Frank Hilley.
After her return to Alabama, while housed in the Calhoun County Jail, the appellant talked to Priscilla Lang, who shared a cell with her at certain times. Lang testified that the appellant told her that she had killed her husband by poisoning and that she had accomplished the poisoning by placing a little arsenic at a time into her victim's food.
As noted earlier, the appellant was placed on trial and convicted for the murder of Frank Hilley and the attempted murder by poisoning of Carol Hilley. She was sentenced to terms of life imprisonment and 20 years, respectively. On appeal the appellant raises the following issues.
 I
The appellant, Audrey Marie Hilley, contends that a search of her purse by Anniston, Alabama, authorities on October 9, 1979, and the removal of items from the purse for testing were illegal and in violation of the Fourth Amendment of the United States Constitution.
The purse in question was stored in the property locker of the Anniston Police Department when Lt. Carrol of the Anniston police removed it and the medicine vials contained therein for analysis. The record reveals that the purse had been inventoried and searched four times: once in Birmingham upon arrest, once in Birmingham prior to transporting appellant to Anniston, and twice after arrival at the Anniston jail.
During each of these inventory searches a note was made of all of the contents of the purse, including the medicine vials. Each of these inventory searches was "reasonable" and a *Page 481 
"constitutionally permissible intrusion." United States v.Edwards, 577 F.2d 883 (5th Cir.), cert. denied, 439 U.S. 968,99 S.Ct. 458, 58 L.Ed.2d 427 (1978).
"The central purpose of the Fourth Amendment is to safeguard the privacy and security of individuals against arbitrary invasions by government officials." South Dakota v. Opperman,428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). Where items have been exposed to police view under unobjectionable circumstances, the individual's expectation of privacy is at least partially dissipated and no reasonable expectation to privacy is breached by an officer's taking a second look at the items. United States v. Grill, 484 F.2d 990, 991 (5th Cir. 1973), cert. denied, 416 U.S. 989, 94 S.Ct. 2396,40 L.Ed.2d 767 (1974). After four inventory searches of the purse, appellant could not have plausibly maintained a reasonable expectation of privacy in the purse or its contents.
In United States v. Burnette, 698 F.2d 1038, 1049 (9th Cir.), cert. denied, 461 U.S. 936, 103 S.Ct. 2106, 77 L.Ed.2d 312
(1983), it was held that once an item has been lawfully seized and searched, subsequent searches of the item, so long as it remains in the legitimate uninterrupted possession of the police, may be conducted without a warrant. The purse in question was lawfully seized and searched and was in the uninterrupted possession of the police.
It would be absurd to hold that medicine vials reinspected during a subsequent search, which complied with the requirements of Burnette, could not be analyzed to determine what substance they contained.
Accordingly, we hold that the October 9, 1979, search of appellant's purse and the removal of items for analysis was not a violation of the Fourth Amendment rights of the appellant.
 II
The appellant contends that the search by the Anniston Police into packages and containers delivered to them by Frieda Adcock, Frank Hilley's sister, was in violation of the Fourth Amendment and that the evidence obtained therefrom was inadmissible. In support of this argument the appellant citesWalter v. United States, 447 U.S. 649, 100 S.Ct. 2395,65 L.Ed.2d 410 (1980). In Walter, a package containing pornographic films was sent to the wrong company, whose employees then opened the package. Being unable to tell if the films were pornographic, the employees then called the FBI and gave the films to them. In order to determine the nature of the films the FBI had to run the films on a projector. The court held that the projection of the films was a significant expansion of the search that had been conducted previously by the private party and therefore must be characterized as a separate search.
In Walter the court noted that the defendants expected no one except the intended recipient either to open the package or project the film and the fact that the package was unexpectedly opened by a third party before it was delivered to the intended recipient did not alter the defendant's legitimate expectation of privacy.
The present case is distinguishable from Walter because Frieda Adcock, who turned the items over to the police, had a legitimate interest or right to possess the packages. Some of the items were property of the appellant that had been stored in Frieda Adcock's basement and others were taken by her from the home of her mother, Carrie Hilley. The items taken from her mother's home at 2315 Moore Avenue in Anniston, were apparently abandoned by appellant because she had moved to another address and had not resided at that address for several months. Frieda Adcock had full access to her mother's home and had her own set of keys to the home and its outbuildings.
Frieda Adcock, therefore, was not an unexpected third party who happened upon the items as was the case in Walter. She had rightful control of the items she gave to the police and was in a position to authorize them to search the items or analyze *Page 482 
them. See United States v. Matlock, 415 U.S. 164, 94 S.Ct. 988,39 L.Ed.2d 242 (1974).
Accordingly, we hold that the search by the Anniston Police into the containers delivered to them by Frieda Adcock was with valid authorization and was not a violation of appellant's Fourth Amendment rights.
 III
The appellant contends that testimony by a furniture store employee concerning a bad check written by appellant to the store was evidence of a collateral crime and should have been inadmissible.
The record reveals that the defense first raised the issue of the furniture when they asked Carol Hilley if her mother had purchased furniture for her at Moss Furniture Company. Carol answered that her mother did purchase the furniture. This question was one in a series of questions by the defense which elicited testimony that the appellant had purchased a car, a motorcycle, some furniture for Carol, and had paid her medical bills.
The state then called Louise Upshaw, an employee of Moss Furniture Company, to testify that the check they were given by appellant in payment for the furniture was not honored. The defense, at that time, objected to the line of questioning on the basis that it was evidence of a collateral crime and was inadmissible. A bench conference was held at which the trial court noted that the defense first put the matter in issue in an attempt to show the appellant was a "loving, caring mother giving gifts to her daughter." The trial court then concluded that since the defense had opened the door the state could present evidence that the appellant had, in fact, not paid for the furniture. The trial court ruled that the prosecution would not be allowed to go into whether the appellant was charged with a crime in connection with the bad check incident but could only inquire as to whether the check was honored. When the trial resumed, the state limited its questions on the matter according to the trial court's ruling.
Where goods are paid for by check, such check is not payment until actually paid, and if the check is dishonored, the seller can recover the goods from the buyer or his assignee if he is not an innocent holder. Peoples Bank Trust Co. v. Walthall,200 Ala. 122, 75 So. 570 (1917), Johnson v. Dairyland InsuranceCo., 398 So.2d 317 (Ala.Civ.App. 1981).
Unless the appellant's check was honored, the furniture company could repossess the furniture from Carol Hilley. In effect, no valid purchase would have taken place.
The appellant first raised the issue of the furniture purchase and elicited testimony that such purchase occurred. The state should not then be precluded from showing that in fact no valid purchase occurred.
The trial court limited questioning on the issue to whether or not the check was honored and specifically directed that no mention be made of any criminal prosecution on the bad check.
Upon a careful review of the record, we find that the responses elicited under this limited scope of questioning were completely admissible to rebut the testimony elicited by the defense.
 IV
The appellant contends that the trial court erred in allowing Frieda Adcock to testify over objection that Frank Hilley told her that "Dr. Jones has told Marie she will have to learn to give me shots at home" and "Frieda, I'm sicker than I've ever been in my life and if something is not done for me I'm not going to be here long." The appellant contends that these statements were hearsay and should have been excluded.
An examination of the record reveals that these statements were made to Frieda Adcock in the presence of the appellant. It is well settled in Alabama that *Page 483 
statements of the deceased are competent evidence against an accused if made in the presence of the accused. Kitchens v.State, 251 Ala. 344, 37 So.2d 428 (1948), Muller v. State,44 Ala. App. 637, 218 So.2d 698 (1968), cert. denied, 283 Ala. 717,218 So.2d 704 (1969), Holland v. State, 162 Ala. 5, 50 So. 215
(1909).
Therefore, we hold that the trial court did not err in allowing the statements into evidence.
 V
The appellant contends the prosecution should not have been allowed to introduce the contents of a letter by Mike Hilley which contradicted Mike Hilley's testimony. The record reveals that the state first called Mike Hilley, the son of Frank Hilley and the appellant, to testify. He was cross-examined by the defense. Later in the trial he was called by the defense and when asked if, in his opinion, his father would have permitted his mother to give him shots, stated that "he would not have." The state on cross-examination questioned the witness about statements contained in a letter he had sent to Coroner Phillips which related his belief that his mother had injected his sister and father with arsenic.
The appellant contends that this questioning by the state was an attempt to impeach its own witness. It is well settled that generally a party cannot impeach his own witness. However, it has been held in this jurisdiction and others that to refresh the witness's memory, to induce him to correct his testimony, to draw out an explanation of his apparent inconsistency, or when taken by surprise, a party may examine his own witness as to his inconsistent or contradictory statements. Jarrell v.State, 35 Ala. App. 256, 50 So.2d 767, reversed on other grounds, 255 Ala. 128, 50 So.2d 774 (1949), affirmed, 255 Ala. 209, 50 So.2d 776 (1951); State v. Duffy, 134 Ohio St. 16,15 N.E.2d 535 (1938); Commonwealth v. La Rue, 381 Pa. 113,112 A.2d 362 (1955); See 98 C.J.S. Witnesses 578 (1957).
Therefore, under the present facts, we hold that the state was completely justified in questioning Mike Hilley about the letter in order to refresh his memory, to induce him to correct his testimony, or to draw out an explanation of his apparent inconsistency.
 VI
The Appellant contends that state exhibits 64, 67, 69, and 70 should not have been allowed into evidence as handwriting samples on the grounds that they contained irrelevant and immaterial matter damaging to her case.
State's exhibit 64 is a letter written by appellant under one of her aliases. At trial, it was offered as a handwriting sample by the state and was objected to by appellant because of its volume. For the first time the appellant now contends that the introduction of the letter was an attempt by the state after resting its case in chief to show the plan or scheme of flight.
It is well settled that objections to evidence cannot be raised for the first time on appeal. Owen v. State,418 So.2d 214 (Ala.Cr.App. 1982); Wood v. State, 416 So.2d 794
(Ala.Cr.App. 1982); Williams v. State, 377 So.2d 634
(Ala.Cr.App.), cert. denied, 377 So.2d 639 (Ala. 1979). Therefore, because the objection the appellant raises with regard to exhibit 64 was not raised at trial, we cannot now entertain it on appeal.
As to state's exhibits 67, 69, and 70, the record reveals that they were the subject of side-bar discussion at which the appellant raised certain objections to their introduction as handwriting samples. At the conclusion of this discussion, the trial court ruled that the exhibits would be admitted if the state laid the proper basis for what the witness did to get his conclusion. Later, after the conclusion of the side-bar discussion, the state offered into evidence exhibits 67, 69, and 70. The appellant raised no objection and in fact stated, "No objection, I guess," whereupon the exhibits were admitted. With this statement the *Page 484 
appellant waived any earlier expressed objections to the admission of the exhibits. The appellant cannot now, on appeal, complain of their admission. Pugh v. State, 247 Ala. 535,25 So.2d 417 (1946).
Therefore, we conclude that state's exhibits 64, 67, 69, and 70 were properly admitted into evidence.
 VII
The appellant contends that she was denied due process under the Fifth and Fourteenth Amendments to the United States Constitution when the trial court denied her motion for production of a transcript of an oral statement made by her to Lt. Gary Carroll of the Anniston Police Department on September 26, 1979.
It is well settled that there is no general constitutional right to discovery in a criminal case. Weatherford v. Bursey,429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977); Reed v.State, 407 So.2d 153 (Ala.Cr.App. 1980), rev'd on other grounds, 407 So.2d 162 (Ala. 1981); Wright v. State,424 So.2d 684 (Ala.Cr.App. 1982).
Accordingly, we hold that the appellant's rights under the Fifth and Fourteenth Amendments to the United States Constitution were not violated and no reversible error was committed when her motion for production was denied.
 VIII
The appellant contends that the state failed to prove beyond a reasonable doubt that Frank Hilley died as a result of arsenic poisoning and further failed to prove that she ever administered arsenic poison to Frank Hilley. She contends that the trial court erred when it did not grant a motion for directed judgment of acquittal based on the foregoing reasons.
The record reveals that the state called as a witness Dr. Joseph Embry, who is a forensic pathologist with the Alabama Department of Forensic Sciences. He testified that on the basis of an autopsy he performed on Frank Hilley and the toxicological findings of Chip Walls, a toxicologist with the Alabama Department of Forensic Sciences, he was able to conclude that Frank Hilley "died from acute arsenic poisoning."
The state therefore put forward substantial evidence that Frank Hilley died of arsenic poisoning.
As to whether the state proved that the appellant administered arsenic poison to Frank Hilley, it should be noted that circumstantial evidence alone may be sufficient to prove the accused's commission of or participation in the killing.Dolvin v. State, 391 So.2d 133 (Ala.), on remand, 391 So.2d 139
(Ala.Cr.App. 1980). A review of the record reveals an abundance of circumstantial evidence which pointed to the guilt of the accused. Our obligation is to examine the record to determine whether there is any theory of the evidence from which the jury might have excluded every hypothesis except guilty beyond a reasonable doubt. Dolvin, supra; Rua v. United States,321 F.2d 140 (5th Cir. 1963), cert. denied, 377 U.S. 969, 84 S.Ct. 1651,12 L.Ed.2d 738 (1964); Riggs v. United States, 280 F.2d 949
(5th Cir. 1960); Williamson v. United States, 365 F.2d 12 (5th Cir. 1966). An examination of the record in this case reveals the fact that the jury was completely justified in excluding every hypothesis except that the appellant was guilty beyond a reasonable doubt of the murder of Frank Hilley.
Therefore, the trial court did not err in refusing to grant the appellant's motion for a directed verdict.
 IX
The appellant contends that the trial court erred in consolidating these two cases for trial and that the defendant was prejudiced thereby to the extent that she was denied her right to a fair trial.
The record reveals that the trial court in ordering consolidation of the cases specifically found that the requirements of Rule 15.3 (a)(i), (ii), and (iii) of the Alabama Temporary Rules of Criminal Procedure *Page 485 
were met. Rule 15.3 provides that "Two or more offenses may be joined in an indictment, information, or complaint, if they: (i) are of the same or similar character; or (ii) are based on the same conduct or are otherwise connected in their commission; or (iii) are alleged to have been part of a common scheme or plan." In both cases the appellant was charged with poisoning a member of her family, allegedly with the purpose in mind of receiving insurance proceeds. This clearly meets the requirements set out in Rule 15.3 (a).
In Holsemback v. State, 443 So.2d 1371 (Ala.Cr.App. 1983), this court noted that the trial judge should weigh the prejudice attendant to a joint trial against the interests of judicial economy. This court went on to note that this balancing process is in the first instance committed to the discretion of the trial court and absent a showing that the trial court abused its discretion, this court will not substitute its judgment for that of the lower court.
The record reveals a full consideration by the trial court of the requirements for consolidation under Rule 15.3, Alabama Temporary Rules of Criminal Procedure, and also a finding that the consolidation would not result in prejudice to the defendant to the extent that she could not be afforded a fair trial. Accordingly, finding no abuse of discretion, we hold that the trial court did not commit error by consolidating the two cases for trial and that the appellant was in no way denied her right to a fair trial by such consolidation.
Therefore this case is due to be affirmed.
AFFIRMED.
All the Judges concur.