KELLUM, Judge.
*1031 The appellant, William Lane Bosner, was convicted of murder made capital because it was committed during the course of a robbery in the first degree, a violation of § 13A-5-40(a)(2), Ala. Code 1975, and murder made capital because it was committed during the course of a burglary in the first degree, a violation of § 13A-5-40(a)(4), Ala. Code 1975, for the killings of Gary "Sambo" Hazelrig and Breann Sherrer. The circuit court sentenced Bosner to life imprisonment without the possibility of parole for each conviction and ordered that the sentences were to run concurrently. The circuit court ordered Bosner to pay a $2,000 fine, $7,030 to the crime victims compensation fund, $924 in restitution, attorney fees, and court costs.
The record indicates the following pertinent facts. Hazelrig, Bosner's drug supplier, lived with Sherrer, his girlfriend, on Deavers Town Road in Locust Fork. Michael Dooley testified that he drove Bosner and Paul Trull to Hazelrig's house at approximately 12:30 a.m. on September 14, 2015, with the intent to steal certain items, drugs, and money. Each of them wore a mask and carried at least one weapon. Specifically, Dooley testified that Bosner carried a .22-caliber rifle with a 10-round factory clip, admitted into evidence as State's Exhibit No. 12-A; Dooley carried a .22-caliber rifle with a banana clip, admitted into evidence as State's Exhibit No. 13-A; and Trull carried a .20 gauge "short shotgun," admitted into evidence as State's Exhibit No. 14-A, and an aluminum "tire checker baseball bat," admitted into evidence as State's Exhibit No. 58-A. (R. 631.) When they arrived, Dooley dropped off Bosner and Trull at the end of Hazelrig's driveway and parked his car in a nearby field. As Dooley walked toward Hazelrig's house, he saw the front door open and heard a gunshot followed by a "ding." (R. 631.) Shortly thereafter, Hazelrig and Sherrer emerged from the house and stood on the front porch. Meanwhile, Trull stood in the doorway and kept them there at gunpoint. According to Dooley, Hazelrig and Sherrer appeared to be injured. Specifically, "Ms. Sherrer had grabbed her butt and Mr. Hazelrig had [ ] a stream of blood coming down maybe right there (Indicating to side of face.)" (R. 636.)
While Trull held Hazelrig and Sherrer at gunpoint, Dooley inspected a four-wheeled all-terrain vehicle ("ATV"), located in Hazelrig's driveway. The ATV, a hunter-green "Yamaha Wolverine," was missing an ignition switch and a tire. (R. 639.) Dooley spent the next several minutes affixing a spare tire to the ATV while Hazelrig and Sherrer remained on the front porch. Dooley testified that Hazelrig and Sherrer were not "crying out or nothing," though Hazelrig said that Sherrer needed medical assistance. (R. 639.)
While Dooley worked on the ATV, he saw Bosner walking inside the house "from the right [side] to the left [side] past the door." (R. 639.) At some point, Trull apparently ordered Hazelrig and Sherrer back inside the house. After Dooley repaired the ATV, he told Trull to "[g]et whatever you're going to get. We need to go." (R. 640.) Dooley testified that Trull turned and called Bosner's name. According to Dooley, Bosner became very nervous because he believed that Hazelrig and Sherrer heard Trull say his name. Dooley told Bosner, "Man don't worry about it. We are leaving.
*1032 They don't really know who it is. Don't worry about it." (R. 641.) Dooley continued tinkering with the ATV when he heard "stomping" on the front porch. (R. 641.) When he looked up, Dooley saw Bosner walk inside the house and fire his rifle. Dooley testified that Sherrer fell to the ground. Immediately thereafter, Dooley heard "about three shots" from Bosner's rifle and one shot from Trull's shotgun. Dooley ran to the front porch and looked through the doorway. He saw Bosner and Hazelrig "fighting it up" on the floor. (R. 643.) During the fight, Trull struck Hazelrig's head with the butt of his shotgun. After Hazelrig was incapacitated, Bosner and Trull picked up their bags and walked to Dooley's car.
Dooley, Bosner, and Trull placed the stolen items in the trunk of Dooley's car. Before leaving, they walked back to Hazelrig's house to collect shell casings and recover the tire checker Trull had apparently forgotten. They found the tire checker but were unable to collect any shell casings. Dooley testified that he, Bosner, and Trull pushed the ATV down Hazelrig's driveway toward Deavers Town Road. Bosner and Trull waited in the driveway while Dooley retrieved his car. Dooley picked up Bosner and Trull and pulled the ATV behind his car to a hiding spot off a nearby road. During the drive back to Dooley's house, Bosner produced several stolen cellular telephones from his pockets. Dooley decided to dispose of the telephones. Dooley drove to a bridge near Zuber Road, and Bosner threw the telephones out of the car window.
Bosner, Trull, and Dooley arrived at Dooley's house at approximately 3:00 a.m. and divided the money and items they had taken from Hazelrig's property. According to Dooley, the stolen items included pocketknives, a small safe, a black-powder pistol, an acoustic guitar, an "iPod" MP3 player, a digital video recorder ("DVR"), a television, and several grams of methamphetamine.
A few hours later, Dooley and Bosner returned to where they had parked the ATV and towed it to Dooley's house. When they returned, Dooley's girlfriend, Carolyn Busby, came to Dooley's house. Dooley testified that he and Busby "[s]at there for a while" and talked. (R. 654.) At approximately 9 or 10 p.m., Dooley drove Bosner to Bosner's girlfriend's house. Bosner carried a backpack and the shotgun Trull used the night before. About a week later, Dooley placed evidence of the Hazelrig-Sherrer murders in a large black box he bought from a Home Depot hardware store. Specifically, the box contained the .22-caliber rifles Dooley and Bosner carried, a stolen safe, television, and black-powder rifle, and various other items both related and unrelated to the crimes. Dooley attached a lock to the box and placed it in the woods off of Zuber Road -- the same location where Bosner had thrown the cellular telephones. Dooley testified that he dropped Hazelrig's DVR and a bag containing Trull's gloves into a lake near the border of Blount County and Jefferson County.
Trull testified that he walked to Dooley's house in the evening of September 13, 2015, to talk and to smoke marijuana. He testified that Bosner was already at Dooley's house when he arrived. Trull testified that he had recently received a paycheck and that he wanted to purchase a new guitar. Bosner told Trull that Hazelrig had several guitars for sale. Consequently, Trull drove with Bosner and Dooley to Hazelrig's house. Trull testified that he and Bosner got out of Dooley's car at the end of Hazelrig's driveway. Bosner opened the trunk and pulled out a backpack "and something else," and proceeded toward Hazelrig's house. (R. 493.) Trull testified *1033 that he saw Bosner walk through Hazelrig's front door and heard "a bit of commotion and then a loud bang." (R. 493.) Moments later, Bosner walked out of the house and handed Trull a .20-gauge sawed-off shotgun. Trull identified the shotgun as State's Exhibit No. 14-A. At this point, Trull noticed that Bosner was carrying a rifle. Trull testified that Bosner ordered him to come inside the house. When he walked inside, Trull saw Hazelrig and Sherrer and noticed that they were injured. Specifically, Trull testified that Hazelrig was bleeding from the top of his head and Sherrer was bleeding from the back of her leg. Bosner ordered Hazelrig and Sherrer to stand on the front porch and told Trull to hold them there at gunpoint. Trull testified that he watched Hazelrig and Sherrer for 10 to 15 minutes while Bosner "rifl[ed] through the house." (R. 503.) Trull testified that he wanted to leave and said "Lane, we need to go." (R. 506.) After Trull spoke Bosner's name, Bosner told Hazelrig and Sherrer to turn around. Trull testified that Bosner placed the barrel of his gun against the back of Sherrer's head and pulled the trigger. According to Trull, Sherrer "was dead before she hit the ground." (R. 509.) Trull testified that Hazelrig charged Bosner and Bosner shot at Hazelrig eight or nine times. While they were fighting, Bosner bumped into Trull and knocked him to the ground, causing Trull's shotgun to discharge and hit Hazelrig. Trull testified that he got up and ran outside after the fight. Bosner emerged from the house a few moments later and helped Dooley push the ATV to the end of Hazelrig's driveway. Before leaving, Dooley went inside the house and retrieved Hazelrig's DVR. Upon returning to Dooley's house, Trull immediately left and walked home. When Trull went back to Dooley's house later that day, Busby already "knew everything" that had occurred the night before. (R. 536.) Trull testified that he assisted Dooley in loading evidence into Dooley's black box.
Charles Ennis, a long-time friend of Hazelrig's, testified that he went to Hazelrig's house on September 15, 2015, to bring Hazelrig food and to check his blood-sugar level. Ennis testified that he looked in a window and saw Sherrer lying on the floor. Ennis telephoned the police and waited for them to arrive. Deputy Jarod Eakes with the Blount County Sheriff's Department responded to the call and taped off the area. Charles Underwood with the Crime Scene Department of the Blount County Sheriff's Department testified that he photographed, measured, diagrammed, and gathered evidence at Hazelrig's house. He testified that there was a large amount of blood at the entrance of the house and on the front door. He testified that there was a blood swipe on the edge of Hazelrig's couch. Underwood recovered multiple .22 shell casings but did not recover any blood, fluid, or fingerprints on the firearms taken into evidence.
On September 26 or 27, 2015, Fred Cochran, a sergeant with the Blount County Sheriff's Department at the time, testified that he received a telephone call from Busby's daughter implicating Dooley in the Hazelrig-Sherrer murders. On September 28, 2015, police interviewed Busby and Dooley. Dooley's taped interviews were admitted into evidence as State's Exhibits No. 62-65. In his first interview that began at approximately 1:45 p.m., Dooley denied any involvement in the crimes. Dooley told police that he drove Bosner to Bosner's girlfriend's house in the evening of September 14, 2015, after they had spent the day mowing a lawn in Lincoln, Alabama. Busby, however, told police that Bosner and Dooley perpetrated the crimes and gave credible information to that effect. Specifically, Busby identified where Sherrer sustained gunshot wounds. She *1034 also informed police about the stolen ATV in Dooley's possession. Consequently, Cochran dispatched two investigators to "go and find" Bosner. (R. 390.)
In Dooley's second interview beginning at approximately 7:00 p.m., Dooley confessed to the crimes and implicated Bosner. Dooley told police about the stolen cellular telephones and the black box containing evidence located off of Zuber Road. Cochran testified that Dooley led police to the black box and gave them a key to open it. Michael Blackwood with the Blount County Sheriff's Department testified that Dooley told police the location of the lake where he disposed of Hazelrig's DVR. A dive team subsequently recovered the DVR, a DVD player, and a backpack. Scott Kanaday with the Blount County Sheriff's Department testified that he recovered the ATV located on Dooley's property.
Bosner's girlfriend, Christina Sturgeon, testified that she was in a dating relationship with Bosner at the time of his arrest. Sturgeon lived with her father, Carl Chapman, in Jefferson County. Sturgeon testified that Bosner occasionally stayed with her at Chapman's house. In the beginning of September 2015, Sturgeon ousted Bosner from the house following an argument. On or around September 21, 2015, Bosner moved back in with Sturgeon. According to Sturgeon, Bosner "was not there a full week before they arrested him." (R. 954.) Sturgeon testified that Bosner brought a backpack with him when he moved back in with her. Sturgeon testified that she did not know the contents of the backpack and that she never opened it. According to Sturgeon, Bosner acted emotional, temperamental, and confrontational in the days preceding his arrest. Two days before Bosner was detained, Sturgeon and Bosner got into an argument. During the argument, Bosner twisted Sturgeon's arm behind her back and "got in [her] face." (R. 948.) Bosner said to Sturgeon: "Just go ahead and call the county on me. You hate me anyway." (R. 948.) Before this occasion, Sturgeon testified, Bosner never acted violently toward her. Sturgeon speculated that Bosner spoke those words because he had Sturgeon's arm pinned behind her back. Sturgeon testified that Bosner never mentioned the Hazelrig-Sherrer murders and that she had no reason to believe he was involved in them.
On September 28, 2015, police located Bosner at Chapman's house and detained him on an "investigative hold." Chapman testified that a "whole lot of police officers" entered his house with their weapons drawn. Chapman testified that police told him "[w]e don't want you. We just want him." (R. 463.) Subsequently, Chapman gave police permission to search his house. He testified that his signature was on the consent-to-search form, though he could not recall signing the document. The consent-to-search form was signed at 5:16 p.m. (C. 860.) Chapman testified that he did "whatever [police] asked [him] to do." (R. 462.)
Deputy Jerry Hughes with the Blount County Sheriff's Department testified that he went to Chapman's house on September 28, 2015, to detain Bosner. He testified that he asked Chapman for consent to search the house. Deputy Hughes stated that he did not have his weapon drawn when he asked for consent. After Chapman consented to the search, police located Bosner's backpack in Sturgeon's bedroom. At trial, Deputy Hughes identified the contents of the backpack, which included a sawed-off shotgun and a wooden box containing several knives. Trull identified the backpack as the same backpack Bosner carried during the Hazelrig-Sherrer murders. The backpack was admitted into evidence as State's Exhibit No. 18-A. Charles Ennis testified that he gifted Hazelrig one *1035 of the knives recovered from Bosner's backpack approximately a year before Hazelrig's death. Ennis testified that he did not know Bosner. The knife was admitted into evidence as State's Exhibit No. 4. Another friend of Hazelrig's, Shane Rush, testified that a black knife recovered from Bosner's backpack also belonged to Hazelrig. Rush testified that he had previously witnessed Hazelrig pull the knife out of a small wooden box. Rush identified the box as the same one found in Bosner's backpack. The box and the knife were admitted into evidence as State's Exhibits No. 9 and 8, respectively. Scottie Hazelrig, Hazelrig's brother, identified a knife with a broken tip recovered from Bosner's backpack. According to Scottie, the knife belonged to Hazelrig. The knife was admitted into evidence as State's Exhibit No. 11.
Dancy Sullivan, a forensic scientist assigned to the Firearms and Tool Mark Section of the Alabama Department of Forensic Sciences, testified that seven of the eight shell casings recovered from Hazelrig's house matched engravings on test bullets fired from the .22-caliber rifle Bosner allegedly carried on the night of the Hazelrig-Sherrer murders. Sullivan testified that the bullets recovered from the crime scene were .22-caliber class bullets "consistent with bullets loaded in .22 long or long rifle caliber cartridges." (R. 807.) Sullivan testified that she could not determine the origin of the shotgun projectiles police recovered.
Kathy Enstice, a medical doctor and forensic pathologist with the Alabama Department of Forensic Sciences, testified that Hazelrig sustained 10 gunshot wounds, including a shotgun wound. She testified that Hazelrig also sustained blunt-force head trauma. Dr. Enstice testified that the combination of gunshot wounds and blunt-force head trauma caused Hazelrig's death. Dr. Enstice testified that Sherrer sustained three gunshot wounds. Sherrer died as a result of a contact gunshot wound to the back of her head.
Teresa Bray, Bosner's mother, testified that she received an e-mail from Bosner while he was incarcerated awaiting trial. The e-mail, admitted into evidence as State's Exhibit No. 74, stated, in pertinent part:
"Date: 8/7/2017 9:11:40 AM
"hey nigga don't frget to call or text ina n see if shell get me some b day money kem n kevin to please I love n miss u look go online to donaldson corrections west jefferson n hollman give me a name out of each camp please n thk u I love n miss yall give rose hugs n kisses ima try to go for st clair if I have to go closer to home."
(C. 857.) Bray testified that Donaldson, West Jefferson, Holman, and St. Clair are prisons in Alabama.
Timothy Calhoun testified that he was living at Chapman's house in September 2015. Two days before Bosner was detained, Calhoun overheard a conversation between Bosner and Sturgeon. On September 28, 2015, Calhoun gave a statement to police, which was admitted into evidence as State's Exhibit No. 75. Calhoun wrote:
"I, Timothy Calhoun, woke up hearing Christina Chapman [sic] and Lane arguing. I heard him say something to Christina, 'If you hate me so much, why don't you just call Blount County and tell them where I am and that you know who killed blank and blank?' I don't remember the names. Before that he tried to get me to see if I could get someone to trade a pistol for his sawed-off shotgun. I only saw it wrapped up in a blue shirt. I noticed after him and Christina were arguing, he was crying. Other than that, if I heard anything else I didn't pay attention or I can't remember.
*1036 If I hear or find anything else out I'll be willing to tell, or if I remember. The argument took place on 08/26/15 [sic]."
(C. 858; R. 874.) Calhoun testified that he intended to write "09/26/15" instead of "08/26/15." (R. 875.) According to Calhoun, Bosner's shotgun was two to three feet long with a wooden stock. Calhoun subsequently identified the shotgun as the same one recovered from Bosner's backpack.
Captain Mack Kent, jail administrator of the Blount County Correctional Facility, testified that Bosner escaped from the county prison on October 8, 2016. Ronald Chastain, lieutenant over road patrol with the Blount County Sheriff's Department, testified that police secured Bosner on Tawbush Road in Locust Fork and transported him back to the jail. Lieutenant Chastain testified that Bosner was walking down the middle of the roadway when they found him. Upon seeing the police, Bosner "went prone in the highway" and did not attempt to flee. (R. 891.) Captain Kent testified that Bosner did not pose any major problems before his escape.
Bosner was subsequently convicted of two counts of capital murder. Bosner filed a motion for a new trial on September 21, 2017. A hearing was held on October 17, 2017. The next day, the circuit court denied Bosner's motion. Bosner filed a timely notice of appeal on October 19, 2017.
I.
Bosner contends that the circuit court erred in admitting the backpack and its contents into evidence because, he says, they were obtained in violation of the Fourth Amendment. Specifically, Bosner argues that Chapman's consent to search was not voluntary and that, even if it was voluntary, Chapman did not have the authority to authorize a search of Sturgeon's bedroom or Bosner's backpack.
" ' " 'This court has long held that warrantless searches are per se unreasonable, unless they fall within one of the recognized exceptions to the warrant requirement. See, e.g., Chevere v. State, 607 So.2d 361, 368 (Ala. Cr. App. 1992). These exceptions are: (1) plain view; (2) consent; (3) incident to a lawful arrest; (4) hot pursuit or emergency; (5) probable cause coupled with exigent circumstances; (6) stop and frisk situations; and (7) inventory searches. Ex parte Hilley, 484 So.2d 485, 488 (Ala. 1985) ; Chevere, supra, 607 So.2d at 368.' "
" ' State v. Mitchell, 722 So.2d 814[, 820] (Ala. Cr. App. 1998), quoting Rokitski v. State, 715 So.2d 859[, 861] (Ala. Cr. App. 1997).' "
Baird v. State, 849 So.2d 223, 229-230 (Ala. Crim. App. 2002) (quoting State v. Otwell, 733 So.2d 950, 952 (Ala. Crim. App. 1999) ).
A.
Bosner argues that Chapman's consent-to-search was not voluntary under the totality of the circumstances. "[T]he question whether a consent to a search is 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." Schneckloth v. Bustamonte, 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed. 2d 854 (1973).
" 'No particular factor should be given undue weight in determining the issue of voluntariness. The fact that a defendant was not informed of the right to refuse to consent does not, of itself, negate a finding of voluntariness. Nor does the fact that the defendant was in police custody or that the officers made a showing of force. Kennedy v. State, 640 So.2d 22, 24-5 (Ala. Cr. App.1993), quoting *1037 Martinez v. State, 624 So.2d 711, 715-16 (Ala. Cr. App. 1993).'
Rokitski v. State, 715 So.2d 859, 861-62 (Ala. Crim. App. 1997)."
State v. Ellis, 71 So.3d 41, 48 (Ala. Crim. App. 2010).
Here, Chapman testified that he gave police oral permission to search his house and signed a consent-to-search form. Although police had their weapons drawn when they entered, Chapman testified that police told him that they did not intend to arrest him. Moreover, Deputy Hughes testified that he did not have his weapon drawn when he asked Chapman for consent to search. See Maples v. State, 758 So.2d 1, 25 (Ala. Crim. App. 1999) (holding that, although the police were armed with guns at the time of the search, there was no indication that they used the guns to coerce the appellant into consenting to the search). Based on the totality of the circumstances, we cannot say that the circuit court erred when it concluded that Chapman's consent to search was voluntarily given. Therefore, Bosner is entitled to no relief on this claim.
B.
Bosner also argues that Chapman did not have authority to consent to a search of Sturgeon's bedroom or of Bosner's backpack. With regard to consent searches, this Court explained in Allen v. State, 44 So.3d 525, 528-29 (Ala. Crim. App. 2009) :
" 'Consent to search may be given by a third party who possesses common authority over the premises or personal effects sought to be searched.' Maples v. State, 758 So.2d 1, 25 (Ala. Crim. App. 1999). 'The authority which justifies the third-party consent rests on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.' United States v. Matlock, 415 U.S. 164, 171 n. 7, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). ' "The burden of establishing th[e] common authority [necessary for a valid consent] rests upon the State" and may be met by proof of either actual or apparent authority.' Smiley v. State, 606 So.2d 213, 215 (Ala. Crim. App. 1992), quoting Illinois v. Rodriguez, 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990)."
"When an accused leaves property in the joint control of another or in a place where one could not reasonably expect to exclude others, he assumes the risk that the joint occupant will consent to a search of the property. See Cowart v. State, 579 So.2d 1, 4-5 (Ala. Crim. App. 1990)." Maples v. State, 758 So.2d at 26.
On the morning of trial, Bosner filed a motion to suppress evidence of the backpack and its contents.[1] A suppression hearing was held the next day. Outside the presence of the jury, Christina Sturgeon testified that she did not know the location of the backpack, only that police told her they had found it in her bedroom. She identified her bed in the background of a photograph of the backpack admitted into *1038 evidence as State's Exhibit 50-B. Sturgeon testified that her bedroom had three entry points -- two doors and one cased opening with a curtain hanging to protect her privacy. Sturgeon testified that she hung the curtain to prevent people from walking through her bedroom to get to the back rooms of the house. She testified that she was "having a lot of problems with [her] stuff getting stolen" before hanging the curtain. (R. 449.)
After Sturgeon's testimony, the State made a proffer that Officer Len Chambless would testify that Chapman handed the backpack to police on the night Bosner was detained. Specifically, the State said in its proffer:
"Judge, the State's evidence is going to be that the officers went there looking for a person -- no property. While they were there, they took custody of the person. And that while they were talking with the other occupants of the house, they obtained consent to search because the father had said, 'Hey, here is this backpack. [Bosner] brought this with him and I want you to take it with you.' They were taking possession of a backpack that the father was handing to them. So they began documenting and processing and then photographed what the father had given them to document and inventorying what they were taking into custody. They had no idea what it was other than it was something that the father was asking them to remove from the home."
(R. 454-55.) The circuit court withheld its ruling on Bosner's motion to suppress subject to the State's proffer. Specifically, the court said:
"Oh yes, I'm not admitting [the backpack and its contents] now. We are going forward as if [defense counsel] had not asked for a hearing outside the presence of the jury. [The State] will go through all the steps necessary to get the bag and its contents admitted into evidence subject to [Bosner's] objections ...."
(R. 458.) Carl Chapman and Deputy Jerry Hughes subsequently testified in the presence of the jury. Over Bosner's objections, the circuit court admitted evidence of the backpack and its contents during Deputy Hughes's testimony. After the jury recessed for the day, Bosner renewed his motion to suppress, arguing that the testimony leading up to the admission of the evidence did not reflect the State's proffer. Specifically, Bosner pointed to the fact that the State never called Officer Chambless to testify. The State indicated that it did not call Officer Chambless to testify because "everything that Len Chambless found" was admitted into evidence during Deputy Hughes's testimony. (R. 586.) Subsequently, the following conversation occurred:
"THE COURT: If you need other witnesses to come back and clarify things, we can do that.
"[PROSECUTOR]: We don't need any clarification.
"[DEFENSE COUNSEL]: We do.
"THE COURT: For the record, Motion to Suppress is denied."
(R. 587.)
Without considering the State's proffer, the evidence at trial tends to establish that the police came into possession of Bosner's backpack pursuant to the search authorized by Chapman. Specifically, the evidence establishes that the police recovered the backpack in Sturgeon's bedroom. Although Chapman may have possessed authority to consent to a search of Sturgeon's bedroom, we cannot say the same about Bosner's backpack. Nothing in the record indicates that Chapman had common authority over the backpack or its contents.
*1039 Indeed, there was no testimony showing that Chapman knew of the backpack, much less that he exercised "joint control" over it. Maples v. State, 758 So.2d at 26. Furthermore, there was no evidence suggesting that the backpack was unzipped when it was discovered, thus ruling out a plain-view analysis. See Cowart v. State, 579 So.2d 1, 4 (Ala. Crim. App. 1990) (holding that an open bag diminishes the expectation that others will not exert control over its contents); see also Hilley v. State, 484 So.2d 476 (Ala. Crim. App. 1985). Finally, the backpack was found inside Sturgeon's bedroom. As evidenced by her testimony, Sturgeon took clear steps to exclude people from entering her bedroom without permission. Consequently, we cannot say that Sturgeon's bedroom constituted a "common area" of the house. Allen v. State, 44 So.3d at 529. Thus, the search of Bosner's backpack was illegal under the Fourth Amendment.
Nevertheless, we conclude that the admission of the backpack and its contents, although error, was harmless. "The United States Supreme Court has recognized that most errors do not automatically render a trial unfair and, thus, can be harmless." Whitehead v. State, 777 So.2d 781, 847 (Ala. Crim. App. 1999), aff'd, 777 So.2d 854 (Ala. 2000), citing Arizona v. Fulminante, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). "After finding error, an appellate court may still affirm a conviction or sentence on the ground that the error was harmless, if indeed it was." Davis v. State, 718 So.2d 1148, 1164 (Ala. Crim. App. 1995), aff'd, 718 So.2d 1166 (Ala. 1998). The harmless-error rule provides, in pertinent part:
"No judgment may be reversed or set aside ... on the ground of ... improper admission or rejection of evidence, ... unless in the opinion of the court to which the appeal is taken or application is made, after examination of the entire cause, it should appear that the error complained of has probably injuriously affected substantial rights of the parties."
Rule 45, Ala. R. App. P. "The purpose of the harmless error rule is to avoid setting aside a conviction or sentence for small errors or defects that have little, if any, likelihood of changing the result of the trial or sentencing." Davis, 718 So.2d at 1164.
In Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), the United States Supreme Court held that before the violation of certain constitutional rights can be held to be harmless, the appellate court must be able to declare a belief that the error was harmless beyond a reasonable doubt. In Ex parte Crymes, 630 So.2d 125 (Ala. 1993), the Alabama Supreme Court explained:
"In determining whether the admission of improper [evidence] is reversible error, this Court has stated that the reviewing court must determine whether the 'improper admission of the evidence ... might have adversely affected the defendant's right to a fair trial,' and before the reviewing court can affirm a judgment based upon the 'harmless error' rule, that court must find conclusively that the trial court's error did not affect the outcome of the trial or otherwise prejudice a substantial right of the defendant."
630 So.2d at 126. See also Ex parte Greathouse, 624 So.2d 208, 210 (Ala. 1993) (holding that the proper harmless-error inquiry asks, absent the improperly introduced evidence, "is it clear beyond a reasonable doubt that the jury would have returned a verdict of guilty").
In the instant case, the jury would have returned guilty verdicts regardless of whether the backpack and its contents *1040 were admitted at trial. The evidence overwhelmingly indicated that Bosner participated in the alleged crimes. Both of Bosner's codefendants -- Dooley and Trull -- identified Bosner as the triggerman. Their testimony that Bosner shot Sherrer at point-blank range was consistent with medical testimony indicating that Sherrer sustained a contact-gunshot wound to the back of her head. Furthermore, the shell casings recovered from Hazelrig's house were fired from the same .22-caliber rifle Dooley saw Bosner carrying on the night of the double murder. Indeed, Dooley and Trull testified with specificity to the facts and circumstances before, during, and after the Hazelrig-Sherrer murders. Their testimony only deviated insofar as Trull maintained his innocence. Even so, Trull consistently testified to Bosner's role in the crimes.
Nonaccomplice testimony also incriminated Bosner. Evidence at trial indicated that Bosner moved into Chapman's house on or around September 14, 2015. Sturgeon testified that on September 26, 2015, two days before Bosner was detained, Bosner violently twisted her arm behind her back during an argument. Sturgeon specifically recalled this incident because Bosner "never touched [her]" in the past. (R. 957.) During the incident, Bosner told Sturgeon to "go ahead and call the county on me. You hate me anyway." (R. 948.) Calhoun, who also lived with Chapman at the time, overheard Bosner say, "If you hate me so much, why don't you just call Blount County and tell them where I am and that you know who killed blank and blank?" (R. 874.) Calhoun told police what he had heard in a statement dated September 28, 2015. Of particular note, Calhoun heard Bosner specifically mention Blount County -- the county in which the crimes transpired -- though Bosner lived at Chapman's house in Jefferson County. Calhoun explained that "blank and blank" was in reference to names he could not recall at the time of his statement. (R. 874.) There is a strong, incriminating inference, however, that Bosner was referring to Gary Hazelrig and Breann Sherrer. Again, on a different occasion, Bosner approached Calhoun and asked him whether he knew anyone who would trade a pistol for his shotgun. Dooley's testimony indicated that Trull carried a shotgun the night of the Hazelrig-Sherrer murders and that Bosner brought the same shotgun with him to Chapman's house later that day.
In the e-mail admitted at trial, Bosner evinced a consciousness of guilt when he asked his mother to look up the names of inmates in several Alabama prisons. Bosner concluded the e-mail by indicating that he wanted to be incarcerated in St. Clair Correctional Facility because it was close to his home. Bosner also showed consciousness of guilt when he escaped from the Blount County Correctional Facility in October 2016. See Horton v. State, 217 So.3d 27, 49 (Ala. Crim. App. 2016) ("Consciousness of guilt can be inferred from an accused's escape from custody.") Thus, even without evidence of the backpack and its contents, the jury would have returned verdicts of guilty beyond a reasonable doubt. Accordingly, Bosner is entitled to no relief on this claim.
II.
Bosner also contends that Dooley's and Trull's accomplice testimony was insufficiently corroborated because, he argues, the backpack and its contents were inadmissible at trial. Bosner contends that without the admission of the evidence found in the backpack there was insufficient evidence to corroborate Dooley's and Trull's accomplice testimony.
"A conviction of a felony cannot be had on the testimony of an accomplice unless corroborated by other evidence *1041 tending to connect the defendant with the commission of the offense, and such corroborative evidence, if it merely shows the commission of the offense or the circumstances thereof, is not sufficient."
§ 12-21-222, Ala. Code 1975.
In Ex parte Hardley, 766 So.2d 154 (Ala. 1999), the Alabama Supreme Court explained:
"In reviewing the application of § 12-21-222, Alabama courts have held:
" 'The test for determining the sufficiency of evidence corroborating the testimony of an accomplice is based on a subtraction process. The accomplice testimony must be eliminated, and then if, upon examination of all other evidence, there is sufficient evidence tending to connect the defendant with the commission of the offense, there is sufficient corroboration. Corroborative evidence need not be strong, and need not be sufficient in and of itself to support a conviction; it need not directly connect the accused with the crime, but only tend to do so. Circumstantial evidence is sufficient to show such corroboration.'
" Goodwin v. State, 644 So.2d 1269, 1274-75 (Ala. Crim. App. 1993) (citations omitted). See, also, Ex parte Woodall, 730 So.2d 652 (Ala. 1998).
" ' " Section 12-21-222 '[d]oes not require corroborative testimony as to material elements of the crime ....' Ex parte Bell, 475 So.2d 609, 613 (Ala.), cert. denied, 474 U.S. 1038, 106 S.Ct. 607, 88 L.Ed.2d 585 (1985), but, the corroborative evidence must 'tend to connect the defendant with the commission of the crime.' § 12-21-222, Code of Alabama 1975. 'The corroboration of an accomplice may be shown by circumstantial evidence.' Kuenzel v. State, 577 So.2d 474, 515 (Ala. Crim. App. 1990), aff'd, 577 So.2d 531 (Ala. 1991), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991)." '
" Wilson v. State, 690 So.2d 449, 456 (Ala. Crim. App. 1995) (quoting Chevere v. State, 607 So.2d 361, 365-66 (Ala. Crim. App. 1992) ). Discussing § 12-21-222, at § 300.01(5), C. Gamble, McElroy's Alabama Evidence (5th ed. 1996), Professor Gamble notes:
" 'Nonaccomplice evidence of the defendant's guilt, to be sufficient corroboration of the accomplice's testimony to take the case to the jury, must tend to connect the defendant with the crime or point to the defendant, as distinguished from another person, as the perpetrator of the crime. Nonaccomplice evidence which merely confirms the way and manner in which the crime was committed, but which is colorless and neutral insofar as the defendant's connection with the crime is concerned, is not sufficient corroboration to warrant submission of the case to the jury.' "
Hardley, 766 So.2d at 157.
Our review of the record indicates that, without consideration of the backpack and its contents, there was sufficient corroborating evidence to connect Bosner with the commission of the alleged crimes. As discussed in Section I-B, supra, the evidence against Bosner included: (1) the argument Calhoun overheard two days before Bosner was detained that included a reference to homicide; (2) Sturgeon's testimony -- corroborating Calhoun's testimony -- that she and Bosner had an argument two days before Bosner was detained; (3) the e-mail Bosner sent his mother while incarcerated awaiting trial; and (4) evidence indicating that Bosner attempted to evade prosecution by escaping from the Blount County Correctional Facility. Alabama law requires only that the corroborating evidence *1042 tends to connect Bosner to the Hazelrig-Sherrer murders and does not need to "be strong enough on its own to support a conviction." Lemaster v. State, 698 So.2d 1158, 1159 (Ala. Crim. App. 1996). Here, there was sufficient evidence corroborating Dooley's and Trull's testimony. Accordingly, Bosner is entitled to no relief on this claim.
Based on the foregoing, the judgment of the circuit court is affirmed.
AFFIRMED.
Windom, P.J., and Burke and Joiner, JJ., concur. Welch, J., dissents, with opinion.

In the record on appeal, Bosner refers to a "Motion to Suppress that was filed this morning" when objecting to testimony regarding a knife found in Bosner's backpack. (R. 303.) On May 1, 2018, this Court remanded this case pursuant to Rule 10(g), Ala. R. App. P., for the circuit court to supplement the record with a copy of the Motion to Suppress referenced at trial. On return to remand, the circuit court stated that no record of a motion to suppress existed in Bosner's case.